**OUACHITA INDUSTRIES, INC.,** Successor to Creswell-Keith, Inc., an Arkansas Corporation, Trustee, and Creswell-Keith Mining Trust, Plaintiff,

v.

**B. F. WILLINGHAM, W. S. (Pete) Bradham** Mildred Willingham and Floy Bradham, Defendants,

**J. E. McMillan and Mary McMillan,** Intervenors.

Civ. A. No. 731.

United States District Court
W. D. Arkansas,
Hot Springs Division.
Dec. 31, 1959.

494

N. L. Schoenfeld, Hot Springs, Ark., Spencer & Spencer, El Dorado, Ark., for plaintiff.

McMillan & McMillan, Arkadelphia, Ark., for Willinghams.

Brown & Compton, El Dorado, Ark., for Bradhams.

McMillan & McMillan, Arkadelphia, Ark., for McMillans.

JOHN E. MILLER, Chief Judge.

This is an action brought by the plaintiff under the Securities Act of 1933, as amended. The section upon which the plaintiff particularly relies is 12(2), 15 U.S.C.A. § 77*l*(2). The action is based upon alleged misrepresentations made by defendants which induced plaintiff's predecessors to purchase certain interests in oil leases and oil field equipment as set forth in an assignment executed by defendants on November 29, 1956. The defendants denied they made any misrepresentations and filed a counterclaim for damages in which they alleged that the plaintiff failed to pay in full the note executed by it as consideration for the assignment.

The intervenors seek to recover the sum of $6,000 allegedly due them by virtue of an assignment from the defendants, and alleged in their intervention that the obligation was assumed by the

plaintiff. The plaintiff in turn filed a counterclaim against the intervenors, in which it alleged that the intervenors were parties to the defendants' misrepresentations.

The case was tried to the court on November 10–12, 1959, and at the conclusion of the trial the case was submitted and briefs were requested from each side. The briefs have been received and considered by the court together with the pleadings, all the testimony, exhibits and entire record. Findings of fact and conclusions of law are included in this opinion, which is filed in accordance with the provisions of Rule 52(a), F.R.Civ.P. 28 U.S.C.A.

The plaintiff, Ouachita Industries, Inc., is an Arkansas corporation, organized in 1959, and is the successor to Keith Mining Trust. By virtue of an indenture, dated March 2, 1956, Creswell-Keith, Inc., was the Trustee for Creswell-Keith Mining Trust. Creswell-Keith, Inc., was also a major shareholder in the Trust. The Trust was originally created to develop and operate uranium mines in Nevada and gold mines in Mexico. The founders of the enterprise were Arch Creswell and R. Neville Keith. Creswell, an engineer, was not directly involved in the oil assignment, and apparently was working in Mexico during the period in question. Keith was the promoter and in charge of the sale of stock in the plaintiff's predecessors. He was the principal representative of plaintiff's predecessors in the purchase of the interests in the leases and the oil field equipment.

The defendants, W. S. Bradham and B. F. Willingham, were partners in the Oil Well Service Company, a partnership, organized in June 1955. The partnership purchased, developed, and serviced oil leases in the south Arkansas fields. Defendant Willingham was and is an automobile dealer at Gurdon, Arkansas. The defendant Bradham is a long-time oil man from El Dorado, Arkansas.

The intervenors, J. E. and Mary McMillan, are husband and wife and operate a mercantile store at Gurdon, Arkansas.

Mr. McMillan loaned money to the defendants on various occasions, and at the time of the assignment to the plaintiff, he was the holder of a mortgage on all of the partnership assets as security for a $40,000 loan. The intervenors are now claiming against the defendants and the plaintiff by virtue of an assignment of January 13, 1956, executed by the defendants and allegedly assumed by the plaintiff.

Originally the plaintiff seemed to contend that between September 6 and November 29, 1956, the parties had a continuing series of interlocking transactions by which Creswell-Keith, Inc., acquired from the defendants Willingham and Bradham certain undivided mineral interests purchased because of oral misrepresentations by defendants, and that in these transactions the defendants made use of the mails in that:

"A. Defendants and plaintiffs entered into an escrow agreement * * *. The escrow agent obtained money by draft through the United States mails.

"B. Defendant signed and mailed * * * a division order * * * (and) caused the Stanolind Oil Purchasing Company to mail its check to plaintiff."

The plaintiff further alleged that "there were other uses of the United States mails * * * not specifically stated here."

On February 28, 1958, the plaintiff filed an amendment to its complaint in which it alleged that as a part of the consideration for the assignment (meaning the assignment dated November 29, 1956) plaintiff was required to send more than 120 payments by means of the United States mails.

In June 1955 the defendants formed the partnership known as the Oil Well Service Company for the purpose of drilling oil wells and operating and servicing them. They obtained certain oil leases and sold a part of the $7/8$th working interest to various persons, such as the plaintiff's witnesses, Harry Sadler and

Oliver Bass. The Oil Well Service Company would furnish the lease, the drilling rig, and the know-how and proceed to drill wells on the lease. Apparently in each instance the arrangements were made and the money was put up by various persons who had purchased part of the ⅞th working interest before the drilling of the well was begun. After the well was drilled the Oil Well Service Company was required to operate it. Thus the drilling of a well gave the partnership an opportunity to keep the rig at work and gave them wells to service.

In addition to the wells which they drilled, they also serviced wells for other people. They charged for their services the customary price, whether it was servicing wells in which they had an interest or wells of third parties.

At the trial of the case the evidence clearly established that there was no continuing series of interlocking transactions, but rather there were three separate and distinct transactions between Creswell-Keith, Inc., and the defendants, but as hereinafter shown the liability, if any, of the defendants to the plaintiff arises from the assignment of November 29, 1956.

In order to properly understand and evaluate the assignment of November 29, 1956, which is the basis of this lawsuit, it is necessary to first examine the actions and events that preceded the execution of the assignment.

On November 21, 1955, Marvin and Virginia Harr assigned a ⅞th working interest in certain oil and gas leases held by them to the defendants. The assignment was recorded on December 3, 1955.

On January 13, 1956, J. E. McMillan loaned $6,000 to the defendants. To secure the payment of the loan, the defendants assigned to McMillan a ⅟₁₆th interest in certain oil and gas leases and guaranteed McMillan a ⅟₁₆th interest in no less than three producing oil wells with the option that if the interest conveyed in the oil wells did not pay McMillan $6,000 in oil royalties plus 6 percent interest within three years, he could elect to have the defendants pay him the sum of $6,000 plus 6 percent interest, less the amount he had received in oil royalties, and McMillan agreed to assign back to the defendants the interest they had assigned to him. This assignment was recorded on January 17, 1956.

On May 14, 1956, J. E. McMillan made another loan of $40,000 to the defendants and took a mortgage on all of the partnership assets. For interest on this loan the defendants assigned to McMillan a ⅟₁₆th interest in certain oil and gas leases and guaranteed him a ⅟₁₆th interest in at least six producing wells. This assignment was recorded on May 17, 1956.

On July 3, 1956, Neville Keith and another director, Dr. Kenneth Stuart, representing the plaintiff, called on defendant Willingham at his place of business in Gurdon, Arkansas. The purpose of this visit was to attempt to sell Willingham stock in the Creswell-Keith Mining Trust. Keith told Willingham of the operations of the Trust, including the Nevada uranium mines and the Mexico gold mines. Willingham declined to purchase any stock, and in the conference told Keith and Stuart of his own oil interests, more in an effort to explain his lack of interest in a project to develop uranium and gold mines than to sell the assets and business of the partnership. However, Keith and Stuart became interested in the oil business, apparently thinking that the opportunities in the oil business were better than those in the mining operations.

Following the conversation of July 3, 1956, there were negotiations in August between the plaintiff, represented by Keith, and the defendants for the purchase of the remaining ⅛th working interest in the so-called "Harr" oil and gas lease. As a result of such negotiations the plaintiff and defendants on September 6, 1956, entered into an escrow agreement at the First National Bank of Gurdon, Arkansas, for the purchase by the defendants of the ⅛th working interest in the "Harr" lease.

Creswell-Keith, Inc., deposited with the bank cashier's checks payable to it for the purpose of obtaining cash with which Creswell-Keith, Inc., could comply with the escrow agreement. The checks were sent through regular banking channels by the bank for the benefit of Creswell-Keith, Inc., and when they were collected, this cash was made available to Creswell-Keith at Gurdon to consummate the transaction.

On September 11, 1956, Marvin and Virginia Harr assigned to the defendants their remaining 1/8th working interest in the oil and gas leases held by them. On the same day the defendants assigned this 1/8th interest to the plaintiff, thereby completing the escrow agreement. The purchase price paid by the plaintiff was $7,000, and consisted of two checks, both of which were sent through the United States mail for collection.

At the trial the plaintiff made no claim that this particular transaction had anything to do with the fraud. All of the testimony on the point was introduced by the defendants. The affidavit from Stanolind Oil Purchasing Company shows on its face that its check was not for one month's runs as plaintiff originally alleged.

On October 12, 1956, the defendants assigned to the plaintiff their interest in the so-called "Pickard" oil and gas leases, reserving for themselves a 1/8th overriding royalty interest.

On October 13, 1956, defendants assigned to the plaintiff an overriding 1/8th interest in certain oil and gas leases referred to as the "Bacon" leases.

The assignment of the Pickard and Bacon leases on October 12 and 13, 1956, was subject to an overriding royalty retained by the sellers, and the consideration of $4,000 was paid for it. There is no allegation that there was any use of the mails or fraudulent representations in either of these transactions, and in fact they are not mentioned in the plaintiff's pleadings.

Following the acquisition of the oil interest in the above leases, the desires of Keith and the other Directors of plaintiff's predecessors increased greatly, and during the months of October and November 1956 Keith and various Directors visited and inspected the south Arkansas oil fields and the office and various leases operated by the defendants.

During this investigation of the oil business in general and in particular of the office and records of the defendants in El Dorado, Arkansas, and the leases then being operated by the defendants and which they were undertaking to develop, Keith and his associates opened negotiations with the defendants for the purchase of all the defendants' oil leases and equipment thereon together with the drilling rig and its equipment. The defendants had lost money in their oil operations since its inception. The plaintiff Keith and his associates were fully advised, not only by the defendants personally but by their examination of the office records. They went personally to each and every lease, and by such investigation learned of the exact status of every operation being conducted by defendants. They knew that the defendants were burdened with numerous debts arising from the oil operations. The major obstacles to the purchase of the interest of the defendants were (1) the plaintiff's lack of cash, and (2) the plaintiff's lack of an experienced oil man to supervise the oil operations. However, in early November 1956 Keith and his associates overcame the second obstacle by obtaining an agreement from the defendant Bradham to accept 200,000 shares of the capital stock of Creswell-Keith Mining Trust in return for his interest in the partnership assets, and he also agreed to manage the oil business for the plaintiff. The defendant Willingham agreed to accept for his interest in the partnership assets "an undivided one-fourth (1/4) interest in and to the aggregate interest presently owned by the said B. F. Willingham and W. S. Bradham in and to the oil and gas leasehold estates in and under said lands as to the formations and strata thereunder down to the depth of 3,300 feet

below the surface of the ground, together with an undivided one-fourth (¼) interest in and to the interest now owned by the said W. S. Bradham and B. F. Willingham in and to all personal property, machinery and equipment now upon said leases and used in connection with the operation thereof."

On November 21, 1956, the plaintiff, represented by Keith, and the defendants met at the office of attorney Duncan McRae at Prescott, Arkansas, and outlined the provisions of their agreement to him. McRae is an able and respected lawyer, and he was instructed by all the parties to draw up the necessary papers to conclude the transaction.

On November 24, 1956, a special stockholders meeting was held at the plaintiff's office in Hot Springs, Arkansas. The meeting was conducted by Keith, and he informed the stockholders that the Board of Directors had agreed to purchase the fractional interest in the leases and equipment thereon together with the drilling rig, etc., owned by the defendants. Defendant Bradham, at the request of Keith and his associates, was present at this meeting. The terms of the agreement were outlined to the stockholders by Keith.

On November 27, 1956, the defendants assigned to J. E. McMillan a 9/16th interest in certain oil and gas leases. This assignment was in accordance with the May 14, 1956, assignment, hereinbefore mentioned, in which the defendants guaranteed McMillan a ⅛th interest in at least six producing oil wells. This assignment was recorded November 30, 1956.

On November 29, 1956, the assignment in question here was executed. Under its terms the plaintiff was to receive all of the interest in the oil and gas leases, oil field equipment, etc., and accounts receivable owned by the defendants subject to the mortgage of J. E. McMillan, and subject to a reservation by defendant Willingham of a ¼th interest in all the oil and gas leases assigned, including equipment on the leases. The consider-

ation for the assignment was the assuming by the plaintiffs of the accounts payable owed by the defendants in the amount of $55,173.36, the assumption of the $30,000 balance of the $40,000 note to J. E. McMillan, the issuance and delivery to defendant Bradham of 200,000 shares of the capital stock of Creswell-Keith Mining Trust stock. In lieu of stock or other remuneration the defendant Willingham was to receive from the operation of the property a portion of the profits, etc., in accordance with the reservations set forth in the assignment.

Following the assignment plaintiff paid the $30,000 balance on the note to McMillan, and also paid over $55,000 of the accounts payable. The United States mail was used in sending checks for a portion of these payments. Between December 1956 and August 1957 plaintiff received through the United States mails $8,726.19 in oil runs. An additional gross amount of $8,383.22 was received from oil well servicing from December 1956 to December 1957.

During the first six months of 1957 the plaintiff drilled several wells on the leases acquired in the November 29, 1956, assignment. None of the wells were commercial producers and they were abandoned. This made Keith and his associates somewhat dissatisfied with the entire transaction.

In October 1957 plaintiff traded a portion of the oil field equipment received in the November 29, 1956, assignment to the defendant Bradham in return for his 200,000 shares of stock. The equipment traded included the portable drilling rig, and the "book value" of the property traded was in excess of $40,000.

The "oral misrepresentations" relied on by plaintiff were particularly set out in the plaintiff's answer to defendants' interrogatory No. 1, as follows:

"Answer to Interrogatory No. 1

"The other oral misrepresentations include representations that:

"1. The oil runs from the wells in the Assignment total $3000 a month.

"2. The monthly income from servicing other wells is $3150.

"3. The defendants serviced 25 to 30 wells.

"4. The equipment and personal property of defendants was worth $127,000.

"5. The accounts receivable amounted to $8000.

"6. The mortgage to Intervenor J. E. McMillan was $27,000.

"7. The mortgage represented defendants only indebtedness to J. E. McMillan.

"8. The $3000 monthly mortgage payments would be serviced by the oil run checks.

"9. The amount of money owed in accounts by defendants was $47,-000.

"10. Well No. A3 would be a long lived producer.

"11. The wells on Parcel 2 were producing.

"A. Wells B1 and B2 were together making 20 barrels of oil a day.

"B. Well B2 was operating and that the only reason it was down when viewed by plaintiff's representatives was that engine needed overhauling and that defendants were ordering parts.

"C. Well C1 was making 25 to 30 barrels a day.

"D. Well C1 was a good operating well.

"E. That C2 was a good little well but would have to be reworked and then would make 5 to 7 barrels daily.

"12. The only reason the December, 1956, oil run checks from Indiana Oil Purchasing Company were $700 odd dollars less than the $3000 necessary to pay the mortgage payment was that the Indiana Oil Purchasing Co. had not collected all the oil in November."

On February 27, 1959, the Court of Appeals for this Circuit held in Creswell-Keith, Inc., v. Willingham, 8 Cir., 264 F.2d 76, that this court has jurisdiction based on the allegations contained in the complaint. However, the court stated at page 82:

"Whether all items involved in these sales constitute securities and whether plaintiff has proved the essential allegations of its complaint as to each sale can best be determined after a trial upon the merits."

The plaintiff abandoned at the trial any claims it might have had against the defendants arising from its purchase of the Harr interest in September 1956 and the Bacon and Pickard interests in October 1956. Therefore, the question of jurisdiction must be determined solely on the basis of the assignment of November 29, 1956.

As to the question of whether all the items involved in that assignment constitute securities, it is noted that the term "security" is defined in Section 2 of the Securities Act, as amended, 15 U.S.C.A. § 77b(1), as including:

" * * * fractional undivided interest in oil, gas, or other mineral rights, * * *."

In Whittaker v. Wall, 8 Cir., 1955, 226 F.2d 868, at page 872, the court said:

"Appellants' next contention is that appellees are entitled to recover only the amounts paid for the 'securities', not the expenditure for equipment or second well payments. They maintain that this is not the usual action in equity for rescission, but is an action under a specific statute which grants a specific right of recovery and that the right of recovery is limited to the 'consideration paid' for the security purchased. Appellants adjudge the distended payments to be outside the definition of 'security' and accordingly not a part of the consideration paid. We do not agree. The securities themselves created the secondary obligations when oil was reached. Also

these payments were made for the purpose of rendering more valuable the primary securities. It would be a perversion of the statute to allow remittances made in conjunction with a void and unlawful security to be exempt from restitution, and would permit unjust enrichment under the guise of statutory definition."

■ In the instant case the equipment and the accounts receivable assigned by the defendants to the plaintiff were a secondary part of the sale of the oil interest, and the testimony presented by both sides concerned both the mineral interest and the personal property. Therefore, all of the items included in the November 29, 1956, assignment will be considered as "securities."

The plaintiff on its brief specifically "makes no claim that there was a violation of Sec. 12(1) of the Securities Act."

Thus, the principal question to be determined in this case is whether the plaintiff has proved the essential allegations of its complaint and is entitled to recover under the provisions of Section 12(2) of the Securities Act, as amended, 15 U.S.C.A. § 77l, which provides:

"Any person who—

\* \* \* \* \* \*

"(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of section 77c of this title), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that

he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, "shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."

This is a statutory cause of action, and the elements which must be proved differ in several respects from the common-law action of fraud and deceit. In Pennsylvania Company for Insurances on Lives and Granting Annuities v. Deckert, 3 Cir., 1941, 123 F.2d 979, at page 985, the court, in discussing Section 12, said:

"We think that Section 12 creates a new cause of action which though bearing some resemblance to the old common law action of deceit nevertheless imposes new obligations upon the vendor of securities and gives new rights to the vendee. For example, it is not necessary for the vendee in maintaining an action for the recovery of consideration to prove that the vendor intended to deceive him as at common law. It is sufficient if the vendor did deceive the vendee even though the vendor had no such intent. Another striking contrast is in the liability for non-disclosure of material facts."

In Thiele v. Shields, D.C.S.D.N.Y.1955, 131 F.Supp. 416, at page 419, the court said:

"All that a plaintiff-purchaser need prove under Section 12(2) is that a statement in a prospectus or oral communication is in fact false or is a misleading omission, and that he did not know of such untruth or omission. The section expressly provides that the defendant must 'sustain the burden of proof that he

did not know, *and in the exercise of reasonable care could not have known,* of such untruth or omission.' "

■ Under the terms of the statute and the decisions interpreting it, the plaintiff in order to recover need only prove that the defendants (1) orally made an untrue statement of a material fact, or (2) omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission).

The evidence offered by the plaintiff to establish the facts requisite to recovery consists generally of two types. The first is made up of testimony of Keith and various other stockholders of the plaintiff corporation concerning oral misrepresentations allegedly made at various times and places by the defendants between July 3 and November 21, 1956. In the plaintiff's answer to defendants' interrogatory No. 1, which was introduced into evidence by the plaintiff, it was stated that the first oral misrepresentation was made by the defendant Willingham at Gurdon, Arkansas, on July 3, 1956. However, the oral testimony of neither Keith nor Dr. Stuart, to whom such alleged misrepresentations were made, support this allegation and contention.

Numerous other dates of alleged misrepresentations are set forth in the plaintiff's answer to interrogatory No. 1. The allegations of such are all very general and indefinite in their tenor, and were not clarified or established by the testimony of the plaintiff's officers and directors. Keith was the only official of the plaintiff allegedly present when all of the misrepresentations were made, yet he gave little or no testimony concerning the alleged misrepresentations made by the defendants between July 3 and November 21, 1956. At the trial plaintiff apparently chose to stand on the answers it gave to defendants' interrogatory No. 1, but allegations of fraud must be proved.

The only substantial evidence of any misrepresentations shown by the testimony concern the proceedings at a stockholders' meeting of the plaintiff corporation on November 24, 1956. At this meeting Keith discussed with the stockholders the terms of the transaction and the nature and extent of the defendants' business. Defendant Bradham was present at this meeting. Keith read from prepared notes as to the valuation of the business owned by the defendants. The figures read include:

"Inventory for Oil Well Service Co.

| | |
|---|---|
| **Assets:** | |
| Equipment | $127,000.00 |
| Accounts receivable | 8,000.00 |
| Monthly income from oil royalties from 12 producing oil wells, approximately. | 3,000.00 |
| Other incomes from servicing wells (25 to 30) averages approximately—monthly. | 3,150.00 |
| **Liabilities:** | |
| Mortgage to McMillan of Gurdon, Ark. payable at $3,000.00 month. | $27,000.00 |
| Accounts payable: | $47,000.00" |

After Keith spoke defendant Bradham stated that the figures given by Keith were substantially correct.

It should be noted, however, that the official minutes of this stockholders' meeting state:

"Mr. Keith said that one week ago the Board of Directors agreed to purchase the Oil Well Service Company of El Dorado, Ark. This company was owned by W. S. Bradham of Ed Dorado and W. F. Willingham of Gurdon, Arkansas. Mr. Bradham traded his interest of the assets for Creswell-Keith Mining stock, and Mr. Willingham retained some of his interests in the production of their wells."

The minutes do not reflect that there was any vote taken by the stockholders to ratify or approve the action of the Board of Directors. While the articles of incorporation of Creswell-Keith, Inc., were not introduced into evidence, Ark. Stats.Ann. Sec. 64–401 (1957 Repl.), provides in part:

"The business of every corporation shall be managed by a Board of Directors, all of whom shall be of full age and at least one (1) of whom shall be a citizen of the United States. The number of directors which shall constitute the whole Board shall be such as from time to time shall be fixed by, or in the manner provided in, the by-laws, but in no case shall the number be less than three (3). Subject only to such limitations as may be provided by this act or the Articles of Incorporation of the corporation, or an amendment thereof, such Board of Directors shall have full control over the affairs of the corporation and may authorize the exercise of all its corporate powers."

■ Therefore the court can only conclude that the Board of Directors was authorized to enter into this transaction and that stockholder ratification was not required.

It should further be noted that at the Board of Directors' meeting held immediately after the stockholders' meeting on November 24, 1956, defendant Bradham was elected a director of Creswell-Keith, Inc., and was also elected chairman of a special Board of Directors' committee in charge of oil production, and was granted authority to sign checks drawn on the plaintiff corporation.

The action of the stockholders and the Board of Directors clearly indicates that the transaction in question here had been agreed to prior to these meetings. The defendants' offer had been accepted, and only the formalities remained to be accomplished. The only possible misrepresentations or omissions shown by the evidence were those orally made by Keith to the shareholders and substantiated by the defendant Bradham, and these occurred after the sale had been agreed upon by the plaintiff's Board of Directors. Bradham testified in this respect that before the meeting Keith requested him to "go along" with any statements he might make so as to encourage more stock sales to the existing shareholders. The subsequent acts of Keith tend to support such a motive.

The second question to be resolved is whether the responsible officials of the plaintiff knew of such misrepresentations or misleading omissions. The evidence in this case clearly indicates that R. Neville Keith was in complete control of the plaintiff corporation and Trust during the period in question. The evidence further shows that Mr. Keith was a man of wide business experience, and was at that time active as a stock promoter of the plaintiff's stock. Prior to the November 29, 1956, assignment, the plaintiff had purchased an interest in three other oil leases from the defendants. Both Willingham and Bradham testified that all of their partnership records were open and available to Keith, and that Keith on several occasions examined the records and asked numerous questions concerning them. This testimony was substantiated by the plaintiff's

witness, John Liedtke, a Director of the plaintiff corporation, who testified that Keith examined the records at the defendants' office at El Dorado on probably a dozen occasions prior to the November 29, 1956, assignment. This Keith denies. By his own admission, however, Keith admits he knew the true status of the defendants' accounts payable and note to J. E. McMillan when he signed the agreement of November 29, 1956.

It is also interesting to note the manner in which Keith treated the transaction in the months following November 29, 1956. He placed the "value" of the assignment to the plaintiff on the corporation's books at an inflated valuation of $324,000. He then sold fractional interests in one of the leases acquired for $42,000.

In the annual report to the stockholders made by Creswell-Keith, Inc., Trustee, by its President, R. Neville Keith, on June 5, 1958, approximately six months after this suit was filed, the following appears:

"Assets

"Current Assets: 1957

Cash on Hand and in Banks ........$ 961.58
Accounts Receivable ............... 6,671.77
Accounts Receivable—Oil Well Service 13,130.94
Accounts Receivable—Other ........ 1,257.48

Total Current Assets ............ $ 22,021.77

"Fixed Assets:

Oil and Gas Leases and Well Equipment 530,805.97
Real Estate, Rental Property, etc. .... 42,724.58
Furniture, Fixtures, Other Service
 Equipment .................... 15,437.83

Total ........................$588,968.38

"Less: Reserve for Depreciation .......... 6,636.29

Net Fixed Assets ............... $582,332.09

"Special Assets:

Mining Claims—State of Nevada property 27,500.00

"Other Assets:

Notes and Accounts Receivable, (including Stock Subscriptions Receivable
 as of December 31, 1956) ......... 8,762.16
Investments—Shore Acres, Inc. ...... 12,500.00
Deferred—Utility Deposits—Organization Expense ................. 3,550.00

Total Other Assets .............. 24,812.16

Total Assets ................. $656,666.02

"Liabilities and Net Worth

"Current Liabilities:

Accounts and Notes Payable—Trade ..$ 29,753.06
Accrued Taxes Payable .......... 353.07
Mortgage Payable ............... 1,478.04

Total Current Liabilities ........ $ 31,584.17

"Fixed Liabilities:

| | |
|---|---:|
| Mortgage Payable—Due Beyond One Year. | 11,766.28 |

"Deferred Income: 3,250.00

 Total Liabilities ................ $ 46,600.45

"Net Worth:

Trust Shares—(Authorized 4,000,000
 shares at 25¢ Par) ..........
Issued and Outstanding, 2,780,524 and
 3,068,831, respectively ............ $210,314.52
Appraisal Surplus—
 December 31, 1956 .............$189,716.08
Add: Appreciation-Appraisal of Oil
 Reserves ...................... 285,250.25

 Total ......................$474,966.33

Less: Adjustment—Disposal of Oil
Leases, Equipment, Depreciation of
Equipment, Oil Reserve Amorti-
zation ........................ 117,117.34

Total Appraisal Surplus—
 December 31, 1957 ............. 357,848.99

Paid in Surplus—December 31, 1956 ..$ 400.50
Increase January 1—December 31,
 1957 ....................... 44,398.20 44,798.70

Earned Surplus—December 31, 1956
 (Deficit) .....................$ (1,710.26)
(Loss)—Year ending December 31,
 1957 ........................ (1,186.38) (2,896.64)

 Total Net Worth—December 31,
 1957 $610,065.57
 Total Liabilities and Net Worth $656,666.02"

---

It is obvious from the testimony that the primary interest of plaintiff was to sell stock in the Creswell-Keith Mining Trust. The Nevada uranium deposits and the Mexico gold mines were rapidly losing their appeal to the stock-buying public. Keith needed something more tangible, and the oil and gas assignment of November 29, 1956, provided this for him. Following the assignment, he was able to place its value on the plaintiff's books at an inflated figure while at the same time selling off interests in the leases to obtain the required cash. The selling price of shares in the Trust was raised by the Board of Directors from 25 cents a share to $2.00 a share, and later was reduced to $1.00 a share.

Fraud is the underlying basis of an action predicated on Section 12(2) of the Securities Act. In this type action, as in the common-law action, fraud is never presumed and must be proved. In the instant case this proof is lacking. In truth and in fact Keith and his associates were highly pleased with the entire transaction prior to their drilling additional wells which resulted in dry holes for their efforts. These unsuccessful wells naturally reduced the value of the mineral leases to the company as a selling point for its stock. When the plain-

tiff realized that the oil interests were declining in value, as had the Nevada uranium mines and the Mexican gold mines, this suit was the result. However, it is difficult, if not impossible, to reconcile the claims made in the suit with the claims and representations that were made to the stockholders on June 5, 1958, approximately six months after this suit was filed.

■ The court, after considering all of the testimony, finds that the defendants did not make "an untrue statement of a material fact," or omitted "to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading" and which resulted in the execution of the asignment of November 29, 1956.

The court further finds that the plaintiff, through Mr. Keith and its other Directors, knew prior to the execution of the assignment on November 29, 1956, the true status of the property of the defendants' partnership. It knew the actual income that the partnership was receiving in the operation of the business. It also knew that no person could prophesy with any degree of accuracy the length of time that an oil well would produce oil in commercial quantities, and thoroughly understood the risks that are involved in investing in drilling oil wells or in keeping producing oil wells in operation.

Therefore, the plaintiff cannot recover on its complaint.

■ The next issue to be considered is the counterclaim filed by the defendants against the plaintiff. In it the defendants seek to recover first the balance due on the $55,173.36 note given them by the plaintiff as provided in the November 29, 1956, assignment. The note was to be discharged by the plaintiff's paying the accounts payable of the defendants, and the accounts and amounts to be paid were listed in the note. The counterclaim alleges that the defendant Willingham paid the sum of $1,872.28 to the General Contract Corporation in satisfaction of one of the accounts assumed by the plaintiff, and that Willingham signed a note payable to the Superior Iron Works in an undisclosed amount in payment of another account. The defendants offered no evidence at the trial in support of these claims, however, and the testimony introduced by the plaintiff indicates that the two accounts were satisfied by it. Therefore, the defendants cannot recover on this item.

■ Next, defendant Willingham seeks to recover his interest in the personal property removed from certain leases by the plaintiff. Under the terms of the November 29, 1956, assignment, defendant Willingham retained a ¼th interest in all the leases assigned and in the personal property thereon. Plaintiff admits in its answer to defendants' interrogatory No. 4 that it removed $2,923 worth of equipment from the Newton A lease and $11,751.50 worth of equipment from the Newton B lease. Defendants assigned to the plaintiff %6ths of a ⅞th working interest in the Newton A lease and 27⁄64ths of a ⅞th working interest in the Newton B lease. Since the defendant Willingham retained ¼th of the interests assigned, he is entitled to his share in the personal property removed from the Newton A lease, which would be %4ths of $2,923, or $411.03, and his share in the Newton B lease would be 27⁄256ths of $11,751.50, or $1,239.30, a total of $1,650.33.

■ Defendant Willingham also retained a ¼th interest in the undeveloped Pickard and Bacon leases. The plaintiff allowed both of these leases to revert to the lessors. Regardless of the reason why the plaintiff permitted the leases to revert or expire, the defendant Willingham did not take any action to keep them in force, and must bear his loss along with the other owners of fractional interests in the same leases. Therefore, he cannot recover on this item.

The Indiana Oil Purchasing Company is holding in suspense the sum of $11,-292.20 as the oil royalties earned between August 1957 and September 1959 by the Bradham-Willingham interests acquired

by plaintiff in the assignment. The defendant Willingham is entitled to ¼th of said sum, or $2,823.05.

The defendants also seek $830.82 as the balance due on accounts to the Gurdon Motor Company and the Willingham office building account. The Gurdon Motor Company is owned by the defendant Willingham, and while both of these accounts were specifically assumed by the plaintiff and admittedly have not been paid, however, Willingham waived any claim on these accounts in his testimony. Therefore, the defendants cannot recover on this item.

The defendants further seek specific performance by the plaintiff of the defendants' obligations to the intervenors McMillans allegedly assumed by the plaintiff. This matter will be discussed later in connection with the intervention.

■ The defendants finally seek an accounting by the plaintiff and the appointment of a receiver to operate the oil wells. The court finds, however, that no useful purpose would be served by granting the requests, and they are not warranted by the evidence.

We now turn to the intervention by J. E. and Mary McMillan. The intervenors have elected to take the option granted them by the assignment of January 13, 1956, and now seek the sum of $6,000 plus interest, less $143.26 received in oil royalties from the interests assigned. The McMillans agree to reassign the interests conveyed.

The McMillans also sought in their intervention an additional three ⅟₁₆th interests in producing oil wells under the terms of the May 14, 1956, assignment. However, this contention has apparently been abandoned as no evidence was introduced in support of it, and no mention of the claim was made in the intervenors' brief.

The obligation, if any, owed by the defendants to the McMillans by virtue of the January 13, 1956, assignment was not specifically assumed by the plaintiff in the November 29, 1956, assignment.

A note in the sum of $55,173.33 was given by the plaintiff to the defendants in partial consideration of the November 29, 1956, assignment. The note was dated November 29, 1956, and contained the following provision:

"The amount of this note equals the hereinafter listed outstanding liabilities of the payees herein, which were and are expressly assumed by the undersigned as one of the considerations for the above mentioned assignment, and which the undersigned agrees to pay in full on or before the maturity date of this note, and it is agreed that any sums paid by the undersigned on the hereinafter listed liabilities of the payees shall be credited upon this note. Said liabilities herein referred to are as follows: * * * "

The liabilities assumed by the plaintiff were then listed with great particularity. Numerous accounts of under $10 were included.

■ Since the note and the assignment of November 29, 1956, constitute one transaction, they must be interpreted together. 12 Am.Jur., Contracts, Sec. 246.

■ In the note, the outstanding liabilities owed by the defendants and assumed by the plaintiff were set forth in detail. However, there appears in the assignment the following:

"A further consideration for this assignment is the assumption by the assignee of all obligations of the assignors set forth in any and all assignments heretofore made by assignors to others of undivided interests in the leases herein assigned."

The amount of the promissory note which plaintiff executed and delivered to the defendants was determined by the amount of the obligations of defendants that was assumed by the plaintiff, and it seems strange that an obligation of $6,000 was not mentioned while other obligations of only a few dollars were specifically set forth.

The latter catch-all provision should not be construed to cover the additional obligation which the defendants may owe to the intervenors, and therefore defendants are not entitled to recover against the plaintiff the amount now claimed due by them to the intervenors.

In reaching this conclusion, the court makes no finding or determination as to the rights, if any, between the intervenors and the defendants arising out of the January 13, 1956, assignment.

The intervenors have in their possession a check dated September 13, 1957, issued by the Indiana Oil Purchasing Company in the amount of $667.66, which represents oil runs for the month of August, and is included in the sum of $11,-292.20 being held by the oil company as royalties earned by the Bradham-Willingham interests between August 1957 and September 1959. Since the plaintiff is entitled to all of said sum, less the sum of $2,823.05 awarded to the defendant Willingham out of said sum, the check held by intervenors should be returned to the Indiana Oil Purchasing Company for cancellation.

The plaintiff included in its answer to the intervention of the McMillans a claim for $30,000, representing the amount paid the intervenors in the discharge of an indebtedness specifically assumed by plaintiff. No specific testimony was introduced in support of such counterclaim, and in view of the conclusions reached by the court as hereinbefore set forth, the counterclaim of plaintiff against the intervenors should be dismissed.

In accordance with the findings of fact and conclusions of law, as hereinbefore set forth, judgment is being entered today as follows:

1. For the defendant B. F. Willingham on his counterclaim in the sum of $1,650.33 against the plaintiff;

2. Dismissing the complaint of the plaintiff against the defendants;

3. Dismissing the claim of the intervenors against the plaintiff;

4. Dismissing the counterclaim of the plaintiff against the intervenors;

5. And further directing the intervenors to return to the Indiana Oil Purchasing Company for cancellation the check now held by them in the amount of $667.66 dated September 13, 1957;

6. That the plaintiff upon receipt from the Indiana Oil Purchasing Company of the amount held in reserve for oil royalties pay therefrom to the defendant B. F. Willingham the sum of $2,823.05;

7. That the defendants and intervenors recover their costs against the plaintiff.