Walston A. LYNN, J. T. Jordan, Maxcy C. Lynn and Houston B. Odom

v.

J. W. CARAWAY, Marvin L. Allison, and Carl W. Jones.

Civ. A. No. 9435.

United States District Court
W. D. Louisiana,
Shreveport Division.

April 8, 1966.

Jackson B. Davis, Robert J. Moffatt, Shreveport, La., for plaintiffs.

Marion K. Smith, Shreveport, La., Marvin L. Allison, in pro. per., L. E. Colvin, Colvin & Hunter, Mansfield, La., Wilburn V. Lunn, Lunn, Irion, Switzer, Trichel & Johnson, Shreveport, La., for defendants.

BEN C. DAWKINS, Jr., Chief Judge.

This action is brought by four individual plaintiffs, all citizens of South Carolina, against three individual defendants, citizens of Louisiana, alleging, in addition to diversity of citizenship, jurisdiction under the Securities Act of 1933.[1] The dispute has arisen over the assignment to plaintiffs of fractional undivided interests in a certain oil and gas lease, located within this district. Plaintiffs seek rescission of the assignment contract and the return of the price paid, some $33,530.00, plus interest, costs, and attorney's fees.

The claim is stated in two alternative theories, the first invoking the civil liabilities provisions of the Securities Act of 1933, particularly sections 5, 12 and 17. The second relies upon the general law of fraud, contained in the provisions of Louisiana Civil Code of 1870, articles 1847 and 2547.

The facts are not too complicated. In early 1962 the defendant Carl W. Jones was the owner of a fractional undivided portion of the ⅞ "working interest" in a certain oil and gas lease, known as the "Stevenson" lease, here in dispute. He was also designated operator of the lease, which contained over 500 acres on

---

[1] 15 U.S.C. §§ 77a et seq. For convenience, reference will be to the original sections of the Act, in accordance with section 1 thereunder. 15 U.S.C. § 77a.

which four producing wells had been drilled. The defendant M. L. Allison was a local oil man, engaged in lease brokering as well as owning and operating oil leases and drilling wells. In the past Allison had bought and sold leases and portions of leases for Jones, as a lease broker.

In July, 1962, Allison was approached by Dr. Walston A. Lynn, one of the plaintiffs herein, who indicated an interest in making oil investments. Allison showed the "Stevenson" lease to Dr. Lynn and discussed a proposition whereby each of the plaintiffs would purchase fractional undivided interests in the lease. During his first sojourn in Louisiana to view the "Stevenson" lease, Dr. Lynn was introduced by Allison to defendant J. W. Caraway, who was president of a local bank in Mansfield, Louisiana.

After his return to South Carolina, Dr. Lynn, who by this time had interested his co-plaintiffs in the particular investment venture with Allison, instructed his banker, Robert E. Sibley, to telephone Caraway, with the view of checking up on Allison through banking channels, and to determine whether Allison was trustworthy and reliable and whether he owned the "Stevenson" lease. Probably as the result of a favorable impression created by Sibley's telephone call to Caraway on July 14, 1962, the plaintiffs became more enthusiastic about the investment. But it was only after a second visit to the lease site on July 23, 1962, by Dr. Lynn, and an actual inspection thereof by two of the other plaintiffs, that Allison received the sum of $33,530.00 from the four plaintiffs.

After Allison received a portion of the funds advanced by plaintiffs, he consummated his agreement with Jones, who had agreed to buy out his co-owners and sell the whole lease—that is, the ⅞ "working interest"—to Allison or his designees. Then, on July 31, 1962, a document evidencing an assignment from Jones of ⅜ of the ⅞ "working interest" to the plaintiffs and ⅝ of the ⅞ to defendant Caraway, as Allison's designee, was prepared and *mailed* to the plaintiffs.[2]

At the time of the assignment, and at all pertinent times, neither Jones nor Allison had registered the sales of these fractional undivided interests in oil rights as "securities" under the Securities Act of 1933.

When Dr. Lynn received the document evidencing the corrected assignment, noting that it came from Jones and not Allison, he stated he began to "smell a rat." He returned to Louisiana September 18, 1962, and discovered that Allison was in extreme financial difficulties, and was probably insolvent. He then employed counsel to advise him as to the proper course of conduct he should take with respect to Allison and his newly acquired lease interests.

Subsequently this action was brought in behalf of all four South Carolina investors seeking rescission of the assignment and return of the price paid. It will be necessary to discuss each of plaintiffs' theories of the case generally and particularly with respect to each of the three defendants.

The financing of the development of oil and gas properties has been as correspondingly peculiar as the technical character of the industry to traditional legal and economic notions. The typical exploitation of oil and gas reservoirs has been by the large oil company which leases large amounts of acreage for their operation even prior to the making of geologic and geophysical estimates. The large company's activities are better suited to the task as the company will usually be a well organized and well financed corporation. But in the less typical, but nonetheless usual, situation an individual or small company will hold

2. Because of an error on the part of Jones, the assignor, the correct proportions of the undivided lease interest were not shown in this assignment, but a corrected document was subsequently mailed evidencing assignment in the intended proportions of the working interest: Walston A. Lynn—⅛; Maxie C. Lynn—⅛; J. T. Jordan—1/16; and Houston B. Odom—1/16.

oil leases, with the expectation of self-development. Therefore, to assist the small operator in his enterprise, the practice of dividing the ownership rights in the leasehold itself has come into wide usage, in order to raise the necessary funds.

The lessor-landowner receives, in addition to a cash bonus, and in some cases a fixed periodic rental payment for the right not to drill immediately, a further promise by the lessee to pay a percentage, usually one-eighth, of the oil and gas actually produced. The lessee's seven-eighths is termed the "working interest." While the large company, with adequate financing, may retain the whole of the "working interest," the small operator may be able to raise needed funds only through the sale of fractional undivided interests in his lease rights, with the commensurate promise to the purchaser to share in the production. Without this facility to raise money the small oil operator would likely be relegated to incorporation, and the sale of shares in his company, an often cumbersome and unsatisfactory manner of raising funds. At the same time, it must be remembered that an investment in an oil venture is often speculative in direct proportion to the chance that oil underlies the particular plot of ground.

The possibility of abuses in such a system of financing is obvious. With the evil in mind, the remedy embodied in the Securities Act of 1933 was designed "to provide full and fair disclosure of the character of the securities sold in interstate commerce and through the mails and to prevent fraud in the sale thereof." In keeping with this broad purpose the Act defined, in section 2(1), the term "security" as meaning, among oth-er things, "any * * * fractional undivided interest in oil, gas, or other mineral rights * * *." The principle underpinning the statutory provision appears to be that no matter what the form or the terminology used, if the interest conveyed does not contemplate operation of the lease or drilling of wells by the purchaser, and does hold out to the purchaser an expectation of profit from the operation of others, the interest is probably a "security" under the Act.[3] Perhaps as a limiting feature, the 1934 amendments supplied a special definition of the term "issuer" with respect to these fractional undivided interests, providing that "issuer" means "the owner of any such right or of any interest in such right (whether whole or fractional) who creates fractional interests therein for the purpose of public offering." Section 2(4).

It therefore follows that not every transaction involving the sale of a fractional undivided interest in oil, gas, or other mineral rights is necessarily the sale of a "security" under the Act. It is only that interest which is created by subdivision of a portion of the owner's interest for the purpose of a public offering for sale which is reached by the Act. Thus if the seller transfers the whole of what he owns, there can be no creation of the interests by him, as "issuer," such as would be counted "securities" within the meaning of the Act. Graham v. Clark, 332 F.2d 155 (6 Cir. 1964); Roe v. United States, 287 F.2d 435 (5 Cir.1961), cert. denied 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 29. See also Woodward v. Wright, 266 F.2d 108 (10 Cir.1959).

The legislative purpose behind such a distinction was well stated in S. E. C. v. C. M. Joiner Leasing Corp., 320 U.S.

---

3. See S.E.C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); S.E.C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943). In the Howey Co. case the Supreme Court said: "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others. If that test be satisfied, it is immaterial whether the enterprise is speculative or non-speculative or whether there is a sale of property with or without intrinsic value. * * * The statutory policy of affording broad protection to investors is not to be thwarted by unrealistic or irrelevant formulae." 328 U.S. at 301, 66 S.Ct. at 1104.

344, 352, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943):

"Oil and gas rights posed a difficult problem to the legislative draftsmen. Such rights were notorious subjects of speculation and fraud, but leases and assignments were also indispensable instruments of legitimate oil exploration and production. To include leases and assignments by name might easily burden the oil industry by controls that were designed only for the traffic in securities. This was avoided by including specifically *only that form of splitting up of mineral interests which had been most utilized for speculative purposes.*" (Emphasis added.)

The Securities Act of 1933 affords protection to the investing public by requiring the filing with the S. E. C. of a registration statement containing material facts bearing upon the investment merit of securities which are publicly offered or sold through the use of the mails or through the instrumentalities of interstate commerce. Thus section 5 provides in part:

"(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

"(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

"(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

Violation of section 5(a) subjects the vendor to liability under section 12(1) of the Act to his vendee for return of the consideration paid for the securities purchased, with interest, less the amount of any income received thereon, upon the tender of the securities; if he no longer owns the security, then recovery is limited to the purchaser's damages.[4] To assert this virtually absolute liability the plaintiff need only allege and prove (1) that the defendant was a seller, or, under section 15, a person in control of a seller;[5] (2) that the mails

---

4. Section 12 provides:
 "Any person who—
 "(1) offers or sells a security in violation of section 5, or
 "(2) offers or sells a security (whether or not exempted by the provisions of section 3, other than paragraph (2) of subsection (a) thereof), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,
 shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."

5. Section 15 provides: "Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 11 or 12, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."
 The typical case under section 15 is rescission as against the purchaser's *immediate seller*, who may be a dealer, or an *underwriter*. But the relief contemplates ultimate recovery over against the

or some means of transportation or communication in interstate commerce was used; [6] and (3) that the defendant failed to comply with the requirements of section 5 of the Act.[7] The only defense to an action under section 12(1), outside of the one-year limitation period provided by section 13, is allegation and proof by the defendant that the particular security or transaction was exempt from the provisions of section 5.[8] Moreover, the burden of proving an exemption rests clearly upon the defendant. See, e. g., S. E. C. v. Ralston Purina Co., 346 U.S. 119, 126, 73 S.Ct. 981, 97 L.Ed. 1494 (1953).

In addition to the liability for violation of section 5 provided by section 12(1), civil relief is available under section 12(2) [9] and section 17 [10] in favor

---

*issuer*, by the innocent middleman. In order for the investor to recover directly against the issuer, the latter must be "in control of" the investor's immediate seller. See generally 3 Loss, Securities Regulation 1808 (2d ed. 1961).

6. While it is true in principle that the use of the mails or interstate commerce must be with respect to the particular plaintiffs, and not just in connection with the offering of the security generally, it has been held that either the mailing of the original of a lease assignment to the official recorder of such documents, or the mailing to the purchaser of a photostatic copy of the assignment, satisfies the requirements of the Act. See Moses v. Michael, 292 F.2d 614, 619 (5 Cir. 1961).

7. An additional prerequisite to recovery has been that adequate tender of the security to the defendant be made. In the oil and gas lease cases, however, the requirement has been relaxed to a significant extent. Adequate tender was made in Moses v. Michael, 292 F.2d 614 (5 Cir. 1961), by each plaintiff in his bill of complaint. And, in Repass v. Rees, 174 F.Supp. 898 (D.Colo.1959), a judgment casting a violator of § 5 was conditioned upon tender into Court of assignments executed by plaintiffs conveying all their right and title to the oil and gas leases, with full warranty.

8. Certain transactions may be exempt from the registration provisions of section 5 under section 4. See, e. g., Garfield v. Strain, 320 F.2d 116 (10 Cir. 1963).

Oil and gas "securities" may be exempt from section 5 under the ordinary exemptions of section 3. However, the peculiarities of financing oil and gas interests are such that a special conditional exemption has been provided for various species of fractional undivided interests in oil and gas rights by Regulation B of the General Rules and Regulations under the Securities Act of 1933. 17 CFR 230.300 et seq. See 1 Loss, Securities Regulation 635 (2d ed. 1961).

9. See note 4, supra.

10. Section 17 provides:

"(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

"(b) It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

"(c) The exemptions provided in section 3 shall not apply to the provisions of this section."

Both sections 12(2) and 17 are complete departures from the common law of fraud and deceit. Whereas section 12(2) provides its own civil remedy, section 17 does not. It has been held that civil liability under section 17 is implied from the language making the proscribed conduct unlawful. See Surowitz v. Hilton Hotels Corp., 342 F.2d 596 (7 Cir. 1965), and cases cited therein at page 604. Moreover, in view of the preservation by sec-

of the purchaser upon whom fraud or other misrepresentations have been practiced. See generally, Annot. 50 A.L.R.2d 1228 (1956).

 Turning to the case here presented, it is clearly established that defendant Jones sold the whole of his interest in the "Stevenson" lease. Because he has not created or issued a "security" within the meaning of the Act, Jones cannot be said to have violated section 5; therefore the section 12(1) remedy is not available against him. Similarly, Jones cannot be liable under either section 12 (2) or section 17 which proscribe the misrepresentation of a material fact in the offer or sale of a "security." But notwithstanding our holding of the nonapplicability of these sections to Jones, as assignor, it is clear from the record that Jones neither made nor participated in the making of any untrue statement or omission in the transactions.

█ On the other hand, the evidence is clear that Allison created a fractional undivided interest in the "Stevenson" lease by purchasing the whole working interest from Jones and selling ⅜ to these plaintiffs. Rather than executing a document evidencing the assignment from Jones to Allison, and another from Allison to plaintiffs, Allison had Jones prepare a document showing an assignment from the latter directly to plaintiffs, and to defendant Caraway, as Allison's designees, which was then mailed to plaintiffs. It is also proven that Caraway was named assignee of a ⅝ interest solely for the convenience of Allison, who held an unrecorded counter-letter. It seems that when Allison fell into financial difficulties he did not take title in his name nor record his counter-letter for fear of attaching creditors. Nonetheless, it was adequately shown that Caraway had no actual interest in the lease, and that he subsequently assigned his record title to Allison's designees for no monetary consideration.[11]

Under this explanation of the significant facts, it is easily seen that Allison created "securities" under section 2(1) of the Act, and his failure to register the sale of the fractional undivided interests going to the plaintiffs constitutes a violation of section 5, which subjects Allison to civil liability under section 12(1) of the act.[12] In reaching this conclusion we have given the benefit of every doubt to Allison, even though he failed to appear at the trial of the case. He was, however, represented by counsel.

Plaintiffs seek to subject Jones to liability on the theory of *respondeat superior*—that he was Allison's principal in the sale of these "securities." They cite

tion 16 of "any and all other rights and remedies that may exist at law or in equity," it is entirely possible that courts would hold sales or contracts in violation of section 17 to be voidable in any event.

11. Plaintiffs have formulated an argument based upon the public records doctrine and the parol evidence rule in an attempt to bind the parties to a situation which would appear to be the case to a third party examining the face of the public records. Just as it is true that these doctrines protect the third party purchaser, neither doctrine is available to prevent these, the parties to the actual transactions, from showing the true character of the transactions, as well as the true consideration paid, by the use of parol evidence and the unrecorded counter-letter.

12. We have been guided to this conclusion by the following cases, each of which was decided on facts quite similar to those found in the case here presented: Can-Am Petroleum Co. v. Beck, 331 F.2d 371 (10 Cir. 1964); Moses v. Michael, 292 F.2d 614 (5 Cir. 1961); Woodward v. Wright, 266 F.2d 108 (10 Cir. 1959); Whittaker v. Wall, 226 F.2d 868 (8 Cir. 1955); Repass v. Rees, 174 F.Supp. 898 (D.Colo.1959); and Dupler v. Simmons, 163 F.Supp. 535 (D.Wyo.1958).

For a general discussion of the applicability of both State and Federal Securities Acts to the sale of fractional undivided interest in oil and gas leases and mineral rights, see Sterling, Impact of State and Federal Securities Acts on Everyday Oil and Gas Transactions, in Southwestern Legal Foundation, Eighth Annual Institute on Oil and Gas Law and Taxation 33 (1957). See also 1 Loss, Securities Regulation, 469 (2d ed. 1961); 3 Loss, Securities Regulation, 1692 (2d ed. 1961); 2 Williams and Meyers, Oil and Gas Law §§ 441 et seq.

Wall v. Wagner, 125 F.Supp. 854 (D.Neb. 1954), aff'd sub nom. Whittaker v. Wall, 226 F.2d 868 (8 Cir.1955), where an individual as "representative" of a corporation sold to the plaintiff a ⅟₁₆ working interest in a lease owned by the corporation, in violation of section 5 of the Act. Both agent and principal were held liable for the return of the price, where "[t]he trial court, on substantial evidence, found specifically that Wagner was an agent of Pay Rock Oil, Inc." 226 F.2d at 871. See also Lennerth v. Mendenhall, 234 F.Supp. 59 (N.D.Ohio 1964).

■ Contrary to plaintiffs' assertions here, we find Jones not to have been the principal of Allison. Although the records of the Louisiana Department of Conservation do not indicate a change in operators for some time after the sales in question, we find the more pertinent evidence clearly points to a final sale from Jones to Allison, rather than a continuing principal-agent relationship. Similarly, we do not find Jones to have been "in control of" Allison within the meaning of section 15 of the Act [13] so as to subject him to joint and several liability with Allison.

The basis of plaintiffs' claim against Caraway seems to stem from his telephone conversation with plaintiffs' banker, Sibley, in South Carolina. It is contended that Caraway knew the circumstances surrounding Allison's insolvency and his failure to relate such information to Sibley was an omission "to state a material fact necessary" to the offer or sale of securities under sections 12(2) and 17 of the Act. Plaintiffs further assert that Caraway was asked point blank: "Does Allison own the Stevenson lease?"; Caraway is said to have replied: "You can rely on anything Allison says." On the other hand, Caraway testified that when asked that question, he replied that he knew none of the details concerning the Stevenson lease. In view of the totality of the circumstances and the fact that Allison subsequently purchased the lease, we think it the more plausible explanation that Caraway knew Allison was dealing with the lease, but did not know exactly who owned it at that time.

■ We find plaintiffs' position untenable for two reasons. First, we do not believe the asserted activity of Caraway is reached by either section 12(2), which provides for the liability of "any person who—* * * (2) *offers or sells a security* * * *" or section 17, which provides, "*it shall be unlawful for any person in the offer or sale of any security* * * *." Any statements or omissions made by Caraway came at a time when by no stretch of the imagination could he have had any interest in the "offer or sale of" these securities.

■ Second, and perhaps more importantly, we find the more pertinent evidence to indicate that Caraway in fact made no proscribed statement or omission under the Act.[14] In reaching this conclusion, we note that Caraway, in addition to speaking with Sibley, also spoke to one Jenkins, another bank official in South Carolina. Even though plaintiffs alleged misrepresentations by Caraway to this gentleman, they failed to produce his testimony at the trial. Thus we must infer that his testimony would corroborate Caraway rather than Sibley.

■ Although the same theories of recovery were stated against all defendants, it was not seriously contended, or shown to the Court, that Jones was guilty of any misrepresentations. It is our further conclusion that inasmuch as neither Jones nor Caraway made any misrepresentation under the Securities Act, *a fortiori*, neither committed any fraud under the general law of fraud in Louisiana. See LSA Civil Code arts. 1847, 2547 (1870).

13. See note 5, supra.

14. In Ouachita Industries, Inc. v. Willingham, 179 F.Supp. 493 (W.D.Ark.1959), it was held that where under the totality of the circumstances, especially with respect to the high risks of failure involved, the evidence was insufficient to establish misrepresentations in the sale of fractional undivided interests in oil and gas leases.

With respect to Allison, however, we find it unnecessary to decide whether he committed any fraud upon the plaintiffs, in view of the adequate relief afforded them under section 12(1) of the Act.

After a further and extensive review of all points raised by all parties hereto, we are unable to find any matter or argument which adds to or detracts from our above conclusions. Therefore for the reasons assigned we find in favor of plaintiffs against defendant M. L. Allison, together with legal interest from judicial demand and costs, less any income received upon these securities. Allison having raised no defense to this suit, for the obvious reason that no meritorious defense exists to plaintiffs' claim for rescission, we award attorney's fees under the provisions of section 11(e) of the Act in the amount of $3,350.00. See Can-Am Petroleum Co. v. Beck, 331 F.2d 371 (10 Cir.1964); Stadia Oil and Uranium Co. v. Wheelis, 251 F.2d 269 (10 Cir.1957). We further find in favor of defendants Carl W. Jones and J. W. Caraway, rejecting plaintiffs' demands.

An appropriate decree should be presented.