266 F.2d 108
 D. A. WOODWARD, J. J. Clancy, Louis S. Slewa, Leslie G.
Agasim, Marie E. Linder and Ann Boling, Appellants,
v.
Homer L. WRIGHT, O. A. Farrell, E. H. Forrest and H. D.
Hanna, Appellees.
 No. 5974.
 United States Court of Appeals Tenth Circuit.
 March 18, 1959, Rehearing Denied April 20, 1959.
 
 R. J. Woolsey, Tulsa, Okl., and N. A. Brown, Chicago, Ill. (Farmer, Woolsey, Flippo & Bailey, Tulsa, Okl., Tillman & Tillman and Don Hampton, Pawhuska, Okl., John B. Durfee, Tulsa, Okl., and Brundage & Short, Chicago, Ill., on the brief), for appellants.
 Everette Cunningham, Kilgore, Tex., and Charles R. Gray, Pawhuska, Okl. (W. N. Palmer, Pawhuska, Okl., was with them on the brief), for appellees.
 Before HUXMAN, MURRAH and BREITENSTEIN, Circuit Judges.
 MURRAH, Circuit Judge.
 
 
 1
 This is an appeal from a judgment for the defendant-appellees, in an action to rescind a contract for the sale of an undivided interest in oil and gas rights and to recover the amount paid thereon.
 
 
 2
 The claim is stated in two alternative theories. The first invokes the civil liability provisions of the Securities Act of 1933. 12(1, 2), Act of May 27, 1933, c. 38, 48 Stat. 84, as amended 9(1, 2), August 10, 1954, c. 667, 68 Stat. 686, 15 U.S.C.A. 77l(1, 2). The other is based upon common law fraud and deceit. Federal jurisdiction is conferred by the Securities Act and by diversity of citizenship and requisite amount in controversy. Inasmuch as the civil liability provisions of the Securities Act are said to impose a stricter liability in transactions within its coverage, Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168, it seems appropriate to first consider the applicability of the Act to this transaction.
 
 
 3
 Section 9(1) of the Securities Act provides in effect that any person who sells a 'security' as defined, in violation of the registration requirements of the Act (5, Act of May 27, 1933, c. 38, 48 Stat. 77; as amended 7, August 10, 1954, c. 667, 68 Stat. 684, 15 U.S.C.A. 77e) is absolutely liable to the purchaser thereof, for recision or damages. Section 9(2), supra, and Section 17 of the Act of 1933 (as amended by Section 10, of the 1954 Act, 68 Stat. 686) grant recision or damages for fraud and misrepresentation in the sale of the securities generally, whether registered or exempt from the registration requirements under Section 7 of the Act. Wilko v. Swan, D.C., 127 F.Supp. 55; Thiele v. Shields, D.C., 131 F.Supp. 416.
 
 
 4
 The Securities Act is, however, concerned only with interstate traffic in 'securities' as that term is comprehensively defined and the civil liability provisions of the Act (whether 9(1) or (2) or 10) have application only to transactions involving 'any security'. We must therefore determine whether that which was sold constituted a 'security'. If not, neither Section 9(1) nor (2) nor Section 10 has application. The Act defines 'security' as including inter alia, '* * * investment contract * * * fractional undivided interests in oil, gas, or other mineral rights'. 2(1), 48 Stat. 74, 15 U.S.C.A. 77b(1).
 
 
 5
 The trial court was of the opinion that the transaction constituted the offering and sale of a 'security' by the requisite interstate means. But it did not think the appellees were 'issuers' of the security as that term is defined in the Act, because they did not 'create a fractional interest in the oil and gas lease for the purpose of public offering.' See 2(4), 48 Stat. 74, 1933, 15 U.S.C.A. 77b(4). Having decided that the transaction was thus exempt from registration under Section 7, the court concluded Section 9(1) was inapplicable to this transaction; that although the appellee-sellers made false representations in connection with the offer of sale, the appellant-purchasers were not misled thereby and could not therefore recover under Section 9(2) of the Act. The court thus apparently found it unnecessary to decide the common law theory of appellants' claim.[1]
 
 
 6
 Not every transaction involving the sale of a fractional undivided interest in oil, gas, or other mineral rights is ipso facto the sale of a 'security' within the meaning of the Act. It was the manifest Congressional intent to exclude from the scope of the Act isolated sales or assignments of oil and gas leases or fractional parts thereof to specific persons, and to specifically include as securities 'only that form of splitting up of mineral interests which had been most utilized for speculative purposes.' S.E.C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 124, 88 L.Ed. 88;[2] Darwin v. Jess Hickey Oil Corp., D.C., 153 F.Supp. 667. This much is made clear when the definition of a 'security' as it relates to fractional undivided interests in oil, gas or other mineral rights, is considered in pari materia with definition of an 'issuer' of fractional interests in oil and gas as the 'owner of any such right or of any interest in such right (whether whole or fractional) who creates fractional interests therein for the purpose of public offering.' 2(4), 48 Stat. 74 (1933), 15 U.S.C.A. 77b(4). If the seller transfers the whole of what he owns, there can be no creation of a fractional undivided interest in oil and gas, and this is so even though what he sold was a fractional interest therein. It follows, we think, that a fractional undivided interest in oil and gas becomes a 'security' when it is created out of the ownership of an interest in oil and gas or other mineral rights for the purpose of sale or offering for sale. Correlatively, the sale or offering for sale of an oil and gas lease, or an undivided interest therein, may be the sale of an 'investment contract', hence a security, when the transaction carries with it something more than the assignment of a 'naked leasehold right', as where the purchasers look entirely to the efforts of other persons to make their investment a profitable venture. S.E.C. v. C. M. Joiner Leasing Corp., supra; S.E.C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244; Penfield Co. of California v. S.E.C., 9 Cir., 143 F.2d 746, 154 A.L.R. 1070; see Annotation 163 A.L.R. 1050.
 
 
 7
 The legislative policy however is to bring all 'securities' within the regulatory scope of the Act without regard to form or legal terminology, and so we look to the facts to determine whether in reality that which was sold in this transaction can be said to be either an investment contract or the creation of fractional interests in oil and gas. S.E.C. v. Universal Service Ass'n, 7 Cir., 106 F.2d 232, certiorari denied 308 U.S. 622, 60 S.Ct 378, 84 L.Ed. 519; S.E.C. v. Crude Oil Corp., 7 Cir., 93 F.2d 844.
 
 
 8
 The pertinent facts are that appellee Wright assigned to appellees Forrest and Hanna an oil and gas lease in Washington County, Oklahoma, retaining for himself an undivided 1/16th interest therein. After drilling and completing two productive wells thereon, Forrest and Hanna, being in financial straits, decided to sell the lease. Wright learned of their plan to sell whem another person called him concerning the sale of his 1/16th interest. He thereupon contacted Forrest and Hanna, who offered to sell the lease for $30,000. Wright insisted that it was worth more and it was finally agreed to offer Forrest and Hanna's interest in the lease for $40,000, $30,000 to Forrest and Hanna, and $10,000 to Wright. Wright knew appellant Woodward as a resident of Chicago who had made some unprofitable investments in oil and gas leases in adjoining Osage County, Oklahoma, and in which Wright was also interested as part owner and operator. Woodward knew something about the lease, and in a telephone conversation Wright told him (Woodward) that it could be bought for $40,000 and was worth more. Woodward asked Wright to send him a letter setting out the details, apparently for the purpose of showing it to other parties who Woodward hoped to interest in the venture. Wright thereupon caused appellee Farrell, a public accountant, to write Woodward, giving the description of the lease, the dates of the completion of the wells, depth, and other essential data. The letter went on to state that the 'current production' of the first well was 12 barrels per day; that the 'current production' of the second well was 32 barrels per day; that 'the engineers advise us that at the end of ten years the Number Two well should still be producing at seven barrels per day. We still have the Bartlesville sand to exploit after we are through with the Tucker (sand). On the Number One well, when we are through in the Bartlesville, we will go only a few feet and start producing it in the Tucker'; that although he (Farrell) had never before taken an interest in an oil lease, he was taking a 1/16th in this one; and that on the basis of $40,000 for the 15/16ths interest, the purchase price of the remaining would be $35,923.08. The letter also stated that Wright would operate the lease and do the paper work.
 
 
 9
 After receipt of Farrell's letter, Woodward showed it to appellants Clancy, Sliwa and Agasim, all of whom had also made unprofitable investments in oil and gas ventures in this particular vicinity and were anxious to recoup their losses. Woodward and Clancy came to Bartlesville, and there with Wright met Forrest and Hanna at the lease site. The properties were inspected and production tests made. Then came appellant Sliwa, who, after an inspection and discussion with Woodward and Clancy, telephoned Agasim in Chicago and told him they were purchasing the lease and were holding 2/16ths for him.
 
 
 10
 After negotiations on price and terms, Woodward, Clancy, Sliwa and Farrell entered into a contract with Forrest and Hanna, in Pawhuska, Oklahoma, to purchase the undivided 15/16ths interest in the leasehold estate for the sum of $40,000, $25,000 to be paid in cash and the balance within two years, secured by a mortgage on the property. The contract specifically provided that Forrest and Hanna would deliver to escrow agent assignments in the lease 'to such parties and in such fractions as may by named by the parties of the second part', i.e. Woodward, Clancy, Sliwa and Farrell. Woodward remained at the lease site to supervise some improvements, and upon his return to Chicago, and about a month after the date of the execution of the contract, the escrow agent was directed to issue assignments for the stipulated fractional interests in the oil and gas leases to the respective parties.[3] When it developed that an undivided 1/16th interest had not been assigned, Wright offered to and did purchase the same at the stipulated price.
 
 
 11
 By agreement, Wright operated the lease, and when, two or three months after the consummation of the sale, the appellants were disappointed in the amount of their oil checks, they complained to Wright, Forrest, Hanna and Farrell. Various explanations were given, one of which was that salt water had encroached on the face of the sand after Forrest and Hanna removed their drilling rig and pumping equipment had been installed on the lease. When the oil runs continued to be disappointing, Wright was discharged as operator. Woodward and Clancy became operators of the lease. Woodward made frequent trips from Chicago. When, in connection with some other state court litigation involving this lease, Woodward and his associates discovered that Wright had received $10,000 of the sale price, and that the sale price for both Wright and Farrell's undivided 1/16th interest had been deducted from that amount, this suit was commenced without further notice or complaint.
 
 
 12
 The basis of the contention that this transaction involved an investment contract is the fact that Wright retained an interest in the lease and became the operator of it after appellants acquired their interests therein. But he did not manage or control the enterprise so that appellants looked to him solely for a return on their investment as in Howey and Joiner. Instead, the appellants owned the dominant and controlling interest in the property, and indeed did control the operation of it even to the point of discharging Wright when they became dissatisfied with his efforts. We think the lease assignment falls short of a scheme which 'involves an investment of money in a common enterprise with profits to come solely from the efforts of others.' S.E.C. v. W. J. Howey Co., supra, 328 U.S. at page 301, 66 S.Ct. at page 1104.
 
 
 13
 The question remains whether the transaction involved the creation of fractional undivided interests in oil and gas, the appellants taking the position that it does. They and the Securities Exchange Commission, Amicus Curiae, insist that Forrest and Hanna conveyed fractional interests in the oil and gas lease they owned to the appellants, thus creating fractional interests in oil and gas. The contract provided for the sale of an entire oil and gas lease. But it clearly contemplated the creation of fractional interests therein and conveyance of the same to the respective purchasercontractees. That which was ultimately conveyed under the terms of the contract was, to be sure, fractional undivided interests in oil and gas. They were created for the purpose of sale. And, they were therefore securities within the meaning of the Act.
 
 
 14
 Since, as we have seen, the Section 9(1) remedy is applicable only to violations of registration requirements of Section 7; and since Section 7 is applicable only to transactions by 'issuers, underwriters or dealers', and inapplicable to transactions by issuers 'not involving any public offering', we must determine whether the appellees fall within the category of an 'issuer' of a security 'for the purpose of public offering'. To be an 'issuer' of fractional interests, hence the issuer of a security within the meaning of Section 7, the appellees must have been the owners of the oil and gas rights, and they must have created fractional interests therein for the purpose of public offering. 2(4), 48 Stat. 74, 1933, 15 U.S.C.A. 77b(4). See 'Securities Regulation' by Louis Loss, 1951, p. 306; Harry Shulman 'Civil Liabilities and the Securities Act', 43 Yale Law Journal 227 (1933). In sum, to come within the requirements of Section 7 and be absolutely actionable under Section 9(1), the transaction must involve the public offering of a security.
 
 
 15
 The statute does not define a public offering and no attempt has been made to judicially formalize it. We know, however, that a public offering is not necessarily a general offering to all classes. Its characterzation does not turn on the number of persons to whom the offer is made-- it may be applicable to a few or many. S.E.C. v. Ralston Purina Co.,346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494. At the same time, number, amount and manner of the offering are distinctly relevant. See Ruling of General Counsel for S.E.C. Jan. 24, 1935, Release No. 285, quoted in Campbell v. Degenther, D.C., 97 F.Supp. 975. The accepted criterion is 'whether the particular class of persons affected need the protection of the Act. An offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering." S.E.C. v. Ralston Purina Co., supra (346 U.S. 119, 73 S.Ct. 984). It is of course incumbent upon the one claiming exemption from the registration requirements to show the lack of public need therefor. Id. See also S.E.C. v. Sunbeam Gold Mines Co., 9 Cir.,95 F.2d 699.
 
 
 16
 The whole tenor of the Act indicates a Congressional purpose to require an accompanying registration statement with the offer or sale of a conventional issue of securities to the general public or a particular class thereof, and to exempt isolated transactions from the onerous burdens of registration requirements. The imposition of absolute liability for failure to register nonexempt transactions was intended to ensure the full and truthful disclosure of all pertinent facts to undisclosed and unidentified prospective purchasers, and to leave the fraud remedies under Section 9(2) and Section 10 to the more intimate and isolated transactions involving known or identifiable prospective purchasers. If this were not so there is no rational justification for exempting transactions under Section 4, 48 Stat. 77 (1966), as amended Aug. 10, 1954, 6, 68 Stat. 684, 15 U.S.C.A. 77d(1), or for that matter, the imposition of absolute liability in one instance and conditional liability in another.
 
 
 17
 We know that oil and gas financing is a strange world of its own. It involves barter and sale of all sorts of interests in oil, gas and other minerals as 'indispensable instruments of legitimate oil exploration and production.' S.E.C. v. C. M. Joiner Leasing Corp., supra, 320 U.S. at page 352, 64 S.Ct, at page 124. To be sure, an offer to sell an oil and gas lease as a single transaction to a specified party or parties is not a public offering so as to require a registration of it under penalty of absolute liability for recision. Nor do we believe it is made so by provision in the contract of sale to convey it in such parts as the buyers may subequently direct, unless of course such arrangement can be said to be a mere subterfuge to avoid registration requirements.
 
 
 18
 In our case, the statement offering to sell was addressed to one person (Woodward) and signed by the agent of the sellers. The contract of sale which the statement induced was between the owners of the lease and Woodward and three of the other purchaser-appellants who were associated with him in the venture. The contract was entered into after on-the-ground inspection and negotiation. Two of the purchaser-appellants (Linder and Boling) were not parties to the contract and were not specified purchasers. Both saw the statement and professed to having relied upon it. But both were closely associated with the parties to the contract and doubtless relied upon their judgment as well. The whole transaction was a closely knit arrangement among friends and acquaintances, and was conducted on a personal basis. Cf. Campbell v. Degenther, supra. All of the purchasers apparently entered into the transaction with sophisticated discernment. Viewed in the whole context of the Act, we see no practical need for the application of absolute liability provisions of Section 9(1) to isolated transactions of this kind.
 
 
 19
 But, as we have seen, the Section 9(2) remedy is applicable to the sale of all securities (with exceptions not here material) whether exempt from the registration requirements or not, or whether the sellers were issuers for the purpose of public offering or not. It affords a remedy for recision or damages against any person who sells or offers to sell any security by means of interstate commerce or the use of the mails 'by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission.' 9(2), 68 Stat. 686 (1954), 15 U.S.C.A. 77l(2). This 'special right to recover for misrepresentation * * * differs substantially from the common-law action in that the seller is made to assume the burden of proving lack of scienter.' Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 184, 98 L.Ed. 168. While the special right was intended to substantially change the common law concept of liability for fraud and deceit, it apparently left the burden of proving falsity, materiality and excusable ignorance with the buyer, see Pennsylvania Co. for Insurances on Lives and Granting Annuities v. Deckert, 3 Cir., 123 F.2d 979; but having done so, the buyer is entitled to recover unless the seller sustains the burden of showing that he did not know the statements were false, or could not have known in the exercise of reasonable care. The trial court's decision is based upon the assumption that the common law duty of proving reliance remains with the buyer. The Congress intened, however, to 'throw the burden of disproving responsibility for reprehensible acts of omission or commission on those who purport to issue statements for the public's reliance', see H.R.Rep.No.85, 73rd Cong., 1st Sess. 9-10; and it did not impose the burden of proving reliance on the false sratement as a condition of recovery. Having explicitly prescribed the conditions for recovery in recision or damages, we cannot read other common law requirements into the 'special right'. To say that purchaser reliance is a prerequisite to seller liability is to import something into the statute which is not there. See 'Securities Regulations' by Loss, supra, 966, 999. The statement in the prospectus mailed to the appellants contained material false statements. The trial court so found and there can be no doubt about it. They were communicated for the purpose of inducing the appellants to purchase the oil properties. There is nothing in the record to show or to indicate that the appellee-sellers did not know of the falsity of the statements in the prospectus or could not have known thereof with reasonable care. We think the proof brought the appellants within the remedy afforded by Section 9(2) and they are entitled to recover thereunder.
 
 
 20
 The case is accordingly reversed and remanded.
 
 
 
 [1]
 In its informal remarks on the record at the conclusion of the case, the court left no doubt of his opinion that the claim could not be sustained under common law fraud and deceit
 
 
 [2]
 Speaking of the definition of fractional undivided interests in mineral rights as securities, Mr. Justice Jackson observed: 'Oil and gas rights posed a difficult problem to the legislative draftsman. Such rights were notorious subjects of speculation and fraud, but leases and assignments were also indispensable instruments of legitimate oil exploration and production. To include leases and assignments by name might easily burden to oil industry by controls that were designed only for the traffic in securities. This was avoided by including specifically only that form of splitting up of mineral interests which had been most utilized for speculative purposes. We do not think the draftsmen thereby immunized other forms of contracts and offerings which are proved as matter of fact to answer to such descriptive terms as 'investment contracts' and 'securities."
 
 
 [3]
 
 Louis S. Sliwa 13/48ths
Leslie G. Agasim 6/48ths
J. J. Clancy 4/48ths
D. A. Woodward 4/48ths
Marie E. Linder 3/48ths
Ann Boling 3/48ths
O. A. Farrell 3/48ths