H. A. SHIMER, Jr., Margaretta Shimer, J. A. Ott, Edward McDevitt, Paul A. Koontz, J. H. Boak, Appellants,

v.

Sherwood F. WEBSTER, Appellee.

No. 3988.

District of Columbia Court of Appeals.

Argued Nov. 21, 1966.

Decided Jan. 19, 1967.

Rehearing Denied Feb. 14, 1967.

Edgar B. May, Washington, D. C., for appellants.

C. William Tayler, Washington, D. C., for appellee.

Before HOOD, Chief Judge, QUINN, Associate Judge, and CAYTON (Chief Judge, Retired).

CAYTON, Judge.

This was an action to rescind a contract for the sale of stock and to recover the price paid under the provisions of the Securities and Exchange Act of 1933 (15 U.S. C. § 77a et seq.). The trial court held that the transaction was exempt from registration with the Securities and Exchange Commission by virtue of its nonpublic nature and that therefore the strict liability imposed on unregistered public sales of stock was not applicable. From that decision, the plaintiff-vendees have appealed.

Appellee, Sherwood Webster, was the "assistant to the President" of LaForce, Inc., a Pennsylvania corporation with its principal place of business in Burlington, Vermont. The corporation was involved in the invention and marketing of an improved engine and carburetor. Webster's office was located in Washington, D. C., in a suite of rooms rented by Jordan and Noble Associates. Noble was general counsel for LaForce.

During the spring and summer of 1961, Webster sold at least 25,000 shares of LaForce which he owned to some eighty to one hundred persons at $5 per share. On July 6, 1961 a preliminary injunction

against the sale of the stock was issued by the United States District Court for Vermont. The injunction became effective on July 26 and was made permanent by consent in October, 1961. Henry Jordan, who shared office space with appellee, was engaged in the sale of some of appellee's stock. On July 25, 1961 Jordan sold appellants H. A. Shimer and his mother, Margaretta Shimer, of Bedford, Pennsylvania 1,150 shares for $11,500.[1] In August, 1961, Jordan sold appellants Ott, McDevitt and Koontz, also from Bedford, 500 shares for $5,000. The same month appellant Boak of Washington was sold 50 shares for $500 by Jordan and Noble.

The appellants who testified at trial were told that some difficulty was being encountered with the Securities and Exchange Commission but that they would receive their stock in January of 1962 when the stock was registered. The $17,000 Jordan received in checks payable to himself or Webster was deposited in the Webster personal account without, according to the testimony, his indorsement or knowledge. On advice of counsel as a result of the injunction and despite the fact that they shared an office, Webster tendered the $17,000 to Jordan by letter saying "it was strictly a loan to me." Webster knew of the existence of appellants by then but testified that he thought Jordan was their agent. By letter dated November 1, 1961, Jordan refused the tender. Appellants were not advised of the tender. No effort was ever made to have the stock registered. After numerous phone calls, several personal visits and a formal demand in December, 1964, the Bedford appellants received their stock and were then informed that it was not registered. Appellant Boak was advised at the same time that he could pick up his stock but that it was worthless.

That same month the appellants filed this suit seeking relief under the Securities and Exchange Act of 1933, 15 U.S.C. §§ 77b, 77d, 77e, 77l, 77m which imposes strict liability for unregistered public sales. A second count asked for rescission based on fraud or on failure of consideration. The trial court denied relief under the Act, holding among other things that it was a nonpublic or private sale requiring no registration. The trial court also found there was no fraud but if it existed it was barred by the statute of limitations. No findings were made as to the failure of consideration. Jordan appeared at trial as a third party defendant but no appeal was taken as to him.

One of the leading cases is Securities and Exchange Commission v. Ralston-Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953). There, 500 employees were offered company treasury stock. Ralston asserted that these people were "key employees" who initiated the sales discussions. The Supreme Court held it was a public sale, saying that numbers alone were not definitive citing a judge's dictum that the term public could mean "anything from two to infinity * * * perhaps even one." 346 U.S. at 125, footnote 11, 73 S.Ct. at 985. While stating that an offer to executive personnel "who because of their position have access to the same kind of information that the act would make available in the form of a registration statement," might be exempt, the employees were not shown to be in such "special circumstances," and hence were just as much members of the investing public as their neighbors. 346 U.S. at 125–126, 73 S.Ct. at 985. An offering to those "able to fend for themselves is a transaction 'not involving any public offering.'" Ibid. The Court concluded that "the focus of inquiry should be on the need of the offerees for the protection afforded by registration" and that the employees "were not shown to have access to the kind of information which regulation would disclose. The obvious oppor-

[1.] The testimony indicated that Jordan and Noble were to receive one share of stock as commission for each one they sold, thus accounting for the $10 per share price to appellants.

tunities for pressure and imposition made it advisable * * *" to impose the sanctions of the Act. Id. at 127, 73 S.Ct. at 985.

In the oft-cited case of Woodward v. Wright, 266 F.2d 108 (10th Cir. 1959), seven persons purchased fractional interests in an oil well. They had made other oil investments and also on-the-spot inspection of the properties as well as oil production tests. The court held it was *not* a public sale because of the inspections and the fact that "the whole transaction was a closely knit arrangement among friends and *acquaintances,* and was conducted on a personal basis." 266 F.2d at 115. "The whole tenor of the Act * * *" requires a registration statement and only exempts "* * * isolated transactions from the onerous burden of registration requirements. The imposition of absolute liability * * * was intended to insure full and truthful disclosure of all pertinent facts to undisclosed and unidentified prospective purchasers * * *." Ibid.

In Garfield v. Strain, 320 F.2d 116 (10th Cir. 1963), a private sale was found invoking the following useful criteria (at 119):

a) smallness of the offering ($10,500) and the small number of offerees (1);

b) fewness of the units offered (1);

c) close relationship and past dealings of the parties;

d) former business and social contacts of the parties;

e) the fact that the investor initiated the transaction;

f) the investor's varied business experience including the stockmarket and prior ownership of stocks similar to the one upon which the suit was founded;

g) an investor such as this did not need the protection of the Act.

In United States v. Custer Channel Wing Corp., 247 F.Supp. 481 (D.C.Md.1965), over a million shares were sold at 25 cents each to some 30 persons. This was considered "manifestly a public offering" citing *Ralston.* 247 F.Supp. at 487. The purchasers did not have "the requisite association with and knowledge of the issuer which make the exemption available." Id. at 488. This decision was rendered despite the fact that at least some of the parties signed statements that they had access to all the pertinent information.

In Collier v. Mikel Drilling Co., 183 F. Supp. 104 (D.C.Minn.1958), eight plaintiffs made investments on three separate oil well tracts. All but two made personal inspections at the seller's request. All were "long time" friends and business associates. All were experienced in this type of investment. In holding an exempt sale the court considered the number of offerees, the number of units, and the size and manner of the offering.

Repass v. Rees, 174 F.Supp. 898 (D.C. Colo.1959), involved four persons who bought 15 fractional oil well interests for $18,000. Testimony showed that no more than 13 additional persons were actually sold interests. While the four plaintiffs were "experienced businessmen and experienced investors," there was "no evidence as to the experience of the buyers other than the plaintiffs. * * *" and "* * * without such evidence in the record the Court cannot determine whether the class needed protection." 174 F.Supp at 904. In our case Margaretta Shimer did not testify at all and at least some of the other appellants were not questioned as to their access or experience. Appellee had the burden to elicit such testimony. Woodward v. Wright, supra, 266 F.2d at 115.

Appellee cites Campbell v. Degenther, 97 F.Supp. 975 (D.C.Penn.1951). There thirty-two shares of an oil well were purchased at $127.40 each. In holding that it was an *exempt* sale, the court found the offering "was limited entirely to those who had participated with defendant in the drilling of previous wells * * *." 97 F.Supp. at

978. Furthermore, the transactions were "a close-knit arrangement among friends and acquaintances on a purely personal basis, without any systematic scheme or promotion program for sale of said securities * * *." Id. at 977.

In its preamble the Securities and Exchange Act of 1933 is stated to be:

An Act to provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails, and to prevent frauds. 48 Stat. 74.

The House Report indicates that the bill permits "an issuer to make a specific or isolated sale of its securities" and only exempts a transaction "where there is no practical need for [the bill's] application or where the public benefits are too remote." H.R.Rept. No. 85, 73rd Cong. 7, 15–16 (1933).

■ We adopt the following as a correct statement of law here applicable:

"Whether a transaction involves a public offering of stock is a question of fact involving many aspects. An important factor * * * is whether the securities have come to rest in the hands of an initially informed group or whether the purchasers are merely conduits for wider distribution." 14 Fletcher, Corporations § 6754, at 223–4 (1966). In determining the nature of the offering "all the circumstances are to be considered." Ibid.

■ The number of offerees not the number of purchasers is the significant factor. "The offering of many units in small denominations * * * indicates the issuer recognizes the possibility, if not probability, of a public distribution." (Footnotes omitted.) 1 Loss, Securities Regulation, at 665 (2d ed. 1961).

Since the Ralston case "* * * the Commission will normally not agree that an offering to, say, more than 30 persons is a private sale unless it is shown that all the

offerees are well informed regarding the issuer. An offering to 80 or 90 institutional investors or millionaires might be regarded as an exempt private offering, because investors of this character do not buy securities without demanding and obtaining full information." Mulford, Private Placements and Intrastate Offerings of Securities, 13 Bus.Law 297, 300 (1958). Similarly, it would probably be permissible to offer privately to fifty to seventy vice-presidents and other senior executives. When a private sale is contemplated, "it is customary to address a letter to the Commission setting forth all the facts * * *" and requesting the Commission to advise. Id. at 301–2.

"An offering to 100 commercial banks is probably not public but an offering to 10 individuals including one old lady unversed in financial matters probably is." Victor & Bedrick, Private Offering: Hazards for the Unwary, 45 Va.Law Rev. 869, 871 (1959).

It also seems helpful to consider expressions of policy by the Securities and Exchange Commission because: "The interpretation by the Commission * * * is entitled to great weight." Campbell v. Degenther, supra, 97 F.Supp. at 977. Their releases are cited in most of the decisions including Ralston.

"To mention a closer case, the Commission was recently persuaded that an offering to some 40 members of a family which, or the ancestors of which, had owned or controlled the issuer for many years, and most of whom were residents of the area where the issuer operated, was exempt as a private offering. * * * In another recent case, the Commission held that an offering to 40 persons whose only affinity was that all were friends or acquaintances of the promoters of the issuer was a public offering." Mulford, supra, 13 Bus.Law at 301.

In Republic Cement Corp., SEC Act Rel. 3816 (1957), sale by 10 promoters to 61 business associates and acquaintances was

not a private sale. They were a diverse group, relatively large in number and were without means of informing themselves as to the corporation's activities.

D. F. Berheimer & Co., SEC Act Rel. 7000 (1963), involved the sale of 175,000 dollars in convertible debentures to 18 of 22 offerees most of whom were shareholders of the issuer. It was held that this was not an exempt sale. "As a general rule, the Commission has considered that an offering made to *not more than* 25 or 30 persons who take the securities for investment (rather than distribution) is a private transaction. * * *" (Emphasis supplied.) 1 Loss, supra at 662.

From the foregoing rather lengthy exposition it is apparent that there is a formidable body of law and interpretation which is at variance with the decision reached by the trial judge in this case. Also, it appears to us that the situation presented only legal questions. Hence we cannot approve appellee's contention that there was merely a factual determination to be made as to whether the sales were exempt as transactions not involving a public offering.

■ In the case before us the following factors were present. At least 25,000 shares were offered to some 100 persons with eighty individuals making purchases involving a minimum of 125,00 dollars. It appeared that there were no past dealings among the parties; that their relationship was impersonal and not based on friendship; that only appellant Shimer could have received adequate information; and that the investment experience of appellants was either limited or nonexistent (thus making them particularly needful of complete information in order to fend for themselves). The transactions were initiated by Jordan and Webster and the inspection of the corporation's inventions was delayed and incomplete. Finally, while the offering of LaForce stock was not technically systematic, the close dealings of Webster and Jordan, Webster's former work in the brokerage field and the substantial number of shares involved cast an unfavorable light on the manner of appellee's offering. We think it must be held as a matter of law, therefore, that this is precisely the type of stock offer requiring registration under the Securities and Exchange Act and that appellants clearly fall within the ambit of its protection. It follows that the decision in favor of defendants was erroneous.

■ The final question is whether the action was barred by limitations. Section 77m of the Act (15 U.S.C. § 77m) provides for a one year statute of limitations. Section 77e(a) (2) states that unless a registration statement is in effect " * * * it shall be unlawful for any person directly or indirectly—to carry or cause to be carried through the mails or in interstate commerce * * * any such security for the purpose of sale or for *delivery after sale.*" (Emphasis supplied.) "Thus, the statute specifically makes 'delivery after sale' unlawful and where there is such a delivery the statute of limitations would not begin to run until the date of such delivery." Buchholtz v. Renard, 188 F.Supp. 888, 892 (S.D. N.Y.1960). See also MacClain v. Bules, 275 F.2d 431, 437 (8th Cir. 1960); Repass v. Rees, supra, 174 F.Supp. at 903.

This suit was instituted the same month that delivery was made. Compliance with the statute was properly pleaded and proved. Hence it is clear that the action was not barred by limitations.

Reversed with instructions to enter judgment in favor of plaintiffs-appellants.