Samuel L. **BRYANT**

v.

**Theodore B. ULAND, Uland Oil Company,
a Sole Proprietorship, and Cherokee
Drilling Corporation.**

**Civ. A. No. 68–H–564.**

United States District Court,
S. D. Texas,
Houston Division.

May 20, 1971.

George Pletcher, Helm, Jones & Pletcher, Houston, Tex., for plaintiff.

Wilson, Pinedo & Hill, Houston, Tex., for defendants.

SINGLETON, District Judge.

*Memorandum and Order:*

Plaintiff, Samuel L. Bryant, filed the instant action against Theodore B. Uland, Uland Oil Company, and Cherokee Drilling Corporation. The object of the suit is to recover from defendant the sum of $26,941.68, being the amount plaintiff alleges to have paid for unregistered securities covering oil and gas leases on lands located in Indiana. Recovery is sought under the provisions of the Securities Act of 1933, 15 U.S.C. § 77e and § 77l(1) (1963).

This action arises out of six transactions between the plaintiff and the defendant, Theodore B. Uland, individually and doing business as the Uland Oil Company, a sole proprietorship. Plaintiff is seeking to rescind the six transactions whereby he purchased undivided fractional interests in certain oil and gas leases in Indiana and to recover the consideration paid to Uland.

Plaintiff contends that defendants were sellers in these transactions and defendants deny that Cherokee Drilling Corporation was a seller. Defendant contends that these transactions constituted exempt transactions under 15 U.S. C. § 77d(1) and § 77d(2) (1963). Defendants further contend that plaintiff is in part barred by the applicable Statute of Limitations, 15 U.S.C. § 77m (1963), and that as to two of the leases, if these transactions are not exempt, plaintiff is barred from recovery by his acts *in pari delicto.*

The six transactions in question relate to the following oil wells located in the State of Indiana: (1) the Keusch #1 and #2 Wells; (2) the Beckley #1 Well; (3) the Schumacher Well; (4) the Perry #1 Well; (5) the McClurkin #1 Well; and, (6) the Spore #1 Well.

The format of each of these six transactions was the same. Defendant Uland prepared an instrument which was termed a Joint Venture Agreement. The Agreement recited that it was entered into "by and between Uland Oil Company of Jasper, Indiana, First Party, and all others (second party) who may associate themselves with the first party as Joint Adventurers and have evidenced such association by appending their signatures hereto * * *."

The number of investors and other pertinent information with regard to each transaction can be found in the following table.

| | Investors | Aggregate Commitment Dry Hole Basis | Completed | Bryant Advances | Undivided Bryant Interest |
|---|---|---|---|---|---|
| | | $ | $ | $ | |
| Keusch #1 & #2 | 13 | 160,000 | 160,000 | 6,000.00 | 1/32 |
| Schumacher | 10 | 13,200 | 26,400 | 4,950.00 | 3/32 |
| Spore #1 | 11 | 15,000 | 30,000 | 2,812.50 | 3/32 |
| Beckley #1 | 10 | 13,200 | 26,400 | 2,475.00 | 3/32 |
| Perry #1 | 10 | 15,000 | 30,000 | 7,500.00 | 1/8 |
| McClurkin #1 | 11 | 15,000 | 30,000 | 3,750.00 | 2/32 |
| | | $231,000 | $302,800 | $27,487.50 | |

The Agreement stated that Uland Oil Company was the owner of certain oil and gas leases. It stated the overriding royalty interests to which the leases might be subject. It described the proposed drilling site of a test well on each lease and further described the objectives of each test well. Finally, the price for each 1/32nd working interest in the test well was stated.

Upon the payment of a fixed price for each working interest, each purchaser individually signing the agreement, including plaintiff, was to receive an interim receipt from Uland Oil Company, which receipt was to be exchanged for an assignment of the undivided interest upon completion of the test well. The Joint Venture Agreement provides for the drilling of a well or wells on a fixed price or a turnkey basis.

As to those leases found to be nonproductive, no assignment of the fractional interest has been delivered to plaintiff by Uland Oil Company. Two of the leases, the Perry #1 Well and the McClurkin #1 Well, were "producing leases." Assignments of the undivided interests in the oil, gas and mineral leases have been made by the Cherokee Drilling Corporation and delivered to plaintiff with regard to the two "producing" leases.

Plaintiff who is an experienced business man, investor, and former executive of a prefabricated building company, was first approached in the spring of 1967 by either or both a Mr. Robert Chandler or a Mr. Jim Bath, who offered plaintiff an interest in the Keusch wells. Bath and Chandler purported to be agents of the defendant. Both men had purchased oil well interests from a Mr. Jim Grafton, defendant's representative in Louisiana. Bath and Chandler had undertaken, through Grafton, to interest certain Houston people in defendant's prospects.

Plaintiff had not met Chandler or Bath prior to the occasion they came to his office to interest him in defendant's oil well prospects. He had had no previous dealings with either Chandler or Bath prior to this encounter.

Either at the time of Bath's and Chandler's first visit or a few days thereafter, plaintiff agreed to purchase the interest in the Keusch well. He signed the Joint Venture Agreement in his office. The Agreement did not mention Bath and Chandler. It had defendant's signature on it at the time plaintiff signed it. Plaintiff signed only a tissue copy of the original Joint Venture Agreement. (Plaintiff's Exhibit No. 1). This instrument contained only his signature and that of defendant. Another copy of this instrument, showing the names of all the participants in the investment, shows that plaintiff's name was inscribed upon the list of investors by Mr. Robert C. Chandler.

At the time plaintiff entered into the Keusch agreement he had never been to Indiana to inspect the premises. Later, in the summer of 1967, plaintiff made two or three trips to Indiana, where he met defendant and, along with Mr. Bath and Mr. Chandler, visited some of defendant's drilling operations.

During this time plaintiff financed the forming of a corporation, Continental Gulf. Plaintiff, Bath and Chandler were the only stockholders and the latter two gentlemen were the officers of this corporation. One of the avowed purposes of this corporation was to sell undivided interests for defendant. And, in fact, Continental Gulf entered into a contract with defendant to sell undivided interests in oil wells and in payment for so doing Continental Gulf received commissions on several sales that it concluded. Plaintiff purchased his interests in the Beckley and Schumacher wells from Continental Gulf.

Section 5(a) of the Securities Act of 1933 provides:

"(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

"(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such

security through the use or medium of any prospectus or otherwise; or

"(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U. S.C. § 77e (1963).

Section 12(1) of the Act imposes a liability upon a vendor violating Section 5(a) to his vendee for a return of the consideration paid for the securities purchased, with interest, less the amount of any income received thereon, upon the tender of the securities.

"To assert this virtually absolute liability the plaintiff need only allege and prove (1) that the defendant was a seller, or, under section 15, a person in control of a seller; (2) that the mails or some means of transportation or communication in interstate commerce was used; and (3) that the defendant failed to comply with the requirements of section 5 of the Act." Lynn v. Caraway, 252 F.Supp. 858, 862–863 (W.D.La.1966), aff'd, 379 F. 2d 943 (5th Cir. 1967).

Defendant Uland concedes that these undivided working interests were "securities" as defined in Section 2(1) of the Act. (15 U.S.C. § 77b(1) (1963). See S. E. C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943); Lynn v. Caraway, supra; Graham v. Clark, 322 F.2d 155 (6th Cir. 1964); Roe v. United States, 287 F.2d 435 (5th Cir.), cert. denied, 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 29 (1961). Defendant also concedes that no registration statement was filed with the Securities & Exchange Commission (S. E. C.) pursuant to the Act respecting these undivided working interests and that plaintiff is given a statutory right to rescind such purchases by Section 12(1) of the Act (15 U.S.C. § 77l(1) (1963)).

Defendant contends that the Act is not applicable in this instance because the transactions in question were exempted under Section 4 of the Act. Section 4 provides that the registration requirements of Section 5 shall not apply to "transactions by an issuer not involving any public offering * * *" Thus, the applicability of the Act in this instance is resolved by determining whether the transactions by Uland involved "any public offering."

In S. E. C. v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953), Ralston Purina offered its treasury stock to its "key employees" and contended that this transaction was a transaction by an issuer not involving any public offering, thus exempt from the registration requirement. On facts which are not relevant here the Supreme Court of the United States set down the standards for determining the applicability of the "private offering" exemption.

The Court noted that "to be public, an offer need not be open to the whole world." While numbers are significant, a small number of offerees will not automatically qualify the transaction for the "private offering" exemption. Of more importance is the statutory purpose. The design of the statute is to protect investors by promoting full disclosure of information necessary to informed investment decisions. Thus, the exemption question turns on the knowledge of the offerees, not on the motives of the issuer. The focus of inquiry is the need of the offerees for the protections afforded by registration. As the Court said:

"Since exempt transactions are those as to which 'there is no practical need for (the bill's) application,' the applicability of § 4(1) should turn on whether the particular class of persons affected need the protection of the Act. An offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.'" Id. at 125, 73 S.Ct. at 984 (emphasis added).

A transaction is exempt when the particular class of offerees has access to the same kind of information that the

Act would make available in the form of a registration statement. United States v. Custer Channel Wing Corp., 376 F.2d 675 (4th Cir.), cert. denied, 389 U.S. 850, 88 S.Ct. 38, 19 L.Ed.2d 119 (1967); Gilligan, Will & Co. v. S. E. C., 267 F.2d 461 (2nd Cir.), cert. denied, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959); Woodward v. Wright, 266 F.2d 108 (10th Cir. 1959).

Defendant would have this court focus its attention solely upon plaintiff. Defendant points to the experience of plaintiff as a business man and as an investor and suggests that since he does not need the protections of the Act, the Act is not applicable. Defendant contends that the other investors in these six transactions were, for the most part, individuals from Alexandria, Louisiana, and were repeat investors who had been recruited by Grafton. By this, defendant seems to suggest that the other investors had access to the type of information that would have been supplied by a registration statement and, therefore, had no need for the protections of the Act. There is little evidence before this Court to indicate the experience of these Louisiana investors, or that of the other non-Louisiana investors in these transactions. There is no evidence as to how many offers were made to other persons, or the experience of those persons. Defendant did not testify that he had made no other offers.

The following discussion in Repass v. Rees, 174 F.Supp. 898 (D.Colo.1959), governs this situation.

"Here the plaintiffs were shown to be both experienced businessmen and experienced investors. As to them, this Court feels that they did not need the protection of the act in relation to these purchases. However, the burden of showing the lack of public need for protection is on the one claiming the exemption, here the defendants. Woodward v. Wright, supra; S. E. C. v. Sunbeam Gold Mines Co., 9 Cir., 1938, 95 F.2d 699. The defendants testified that they sold securities in the first transaction to no more than

nine persons. And to no more than four persons in the second transaction. But there is no evidence as to the experience of the buyers other than the plaintiffs. And there is no evidence as to how many offers were made to other persons, or the experience of those persons. The defendants did not testify that they had made no other offers. Without such evidence in the record the Court cannot determine whether the class needed protection. It was incumbent on the defendants to submit this evidence. Since they did not they must suffer the consequences." *Id.* at 904.

■■ The burden of proving an exemption rests clearly upon the issuer claiming the exemption. S. E. C. v. Ralston Purina Co., *supra;* United States v. Custer Channel Wing Corp., *supra;* Lynn v. Caraway, *supra;* Gilligan, Will & Co. v. S. E. C., *supra;* Woodward v. Wright, *supra;* S. E. C. v. Sunbeam Gold Mines Co., 95 F.2d 699 (9th Cir. 1938). Defendant has not sustained his burden in this case.

Since these transactions do not qualify for the "private offering" exemption, the court must now turn to defendant's contention that four of these transactions are barred by the applicable statute of limitations.

Section 13 of the Act, in part, provides: "No actions shall be maintained * * * to enforce a liability created under Section 77l(1) of this title, unless brought within one year after the violation upon which it is based." 15 U.S.C. § 77m (1963). Thus, a cause of action based upon Section 5(a) of the Act accrues at the time Section 5(a) is violated, and the plaintiff has a period of one year from the time the Section is violated in which to bring suit.

Section 5(a) is violated when a person, directly or indirectly, makes use of any means or instrument of interstate commerce or of the mail to sell a security or carries the security or causes it to be carried through the mails or through instruments of interstate commerce for the purpose of sale or for delivery after

sale. Thus, it is clear that if the seller uses the mails or an instrument of interstate commerce to effectuate any one of the stages of the sales transaction or for delivery after sale, he violates the Act.

"In short, the use of either interstate commerce or the United States mails at any time from the inception of the negotiations for the sale of the security to the delivery of the security is consummated subjects the transaction to the regulation and control of the Securities Act of 1933." Dupler v. Simmons, 163 F.Supp. 535, 540 (D. Wyo.1958).

In the case of Blackwell v. Bentsen, 203 F.2d 690 (5th Cir. 1953), cert. denied, 347 U.S. 925, 74 S.Ct. 528, 98 L.Ed. 1078 (1954), the plaintiffs purchased lands from a development company for the purpose of developing the tracts into citrus groves. It was not contended that the mails had been used for the purpose of sending out advertising for the sale of the lands, but all deeds and contracts by which the transactions were consummated were returned by the seller to the purchasers through the mails. The court held that this was a sufficient use of the mails to bring the case within Section 12(2) of the Act. The court pointed out that the Act should be liberally construed to accomplish the legislative purpose in adopting it, which is to prevent the use of mails or other instrumentalities of interstate commerce in the perpetration of investment frauds.

In Wall v. Wagner, 125 F.Supp. 854 (D.Neb.1954), aff'd sub nom., Whittaker v. Wall, 226 F.2d 868 (8th Cir. 1955), the plaintiffs drove from Norfolk, Nebraska, to Lincoln, Nebraska, where they met Wagner and traveled with him to Madison, Kansas. There they were introduced by Wagner to Whittaker. On the same day Wagner and Whittaker took plaintiffs to different tracts of land, showing them oil wells with pumping station equipment in operation and stated the amount of production of such wells and other facts. The parties went to the office of defendant Pay Rock Oil, Inc., and after some discussion plaintiffs signed an agreement authorizing Wagner to procure on their behalf a working interest in certain oil properties. They entered into an agreement providing that plaintiffs would pay $3,000 plus an additional $1,500 for drilling expenses if oil were found on the leasehold. The plaintiffs also acquired an option to purchase a similar interest in another oil and gas lease. In connection with this transaction plaintiffs made out and delivered a check in the sum of $3,000 to Whittaker as payee. Plaintiffs returned to their home in Norfolk, Nebraska, without a copy of the agreement. A few days later plaintiffs wrote to the secretary of Pay Rock Oil, Inc., at Eureka, Kansas, for their copy of the agreement and it was forwarded to them through the mails. Shortly thereafter the contract was sent by mail from Eureka, Kansas, to plaintiffs at Norfolk, Nebraska. A statement in the amount of $1,500 for equipment and completion costs was sent through the mails. Plaintiffs remitted a check through the mails in the amount of $9,000. Under this set of facts, the Eighth Circuit held that the transaction was in violation of the Securities Act.

In Repass v. Rees, *supra*, plaintiffs sought to rescind two transactions whereby they had purchased undivided fractional interests in three oil and gas leases.

With regard to the question of whether the Securities Act had been violated, the court said:

" * * * The fact that the defendants sold securities involved in the first transaction while traveling from one state to another in an automobile for the express purpose of selling those securities does not establish a violation of the Act. The use of one's personal car in such a situation is not the use of an '[instrument] of transportation * * * in interstate commerce.' This also holds true in regard to the transportation of the checks given to defendants by plaintiffs from Iowa to Colorado where the defendants deposited them in a bank. Nor is

there a use of an instrument of interstate commerce when those checks were sent back to the drawee bank in Iowa in the usual course of business.

However, the securities, i. e. the assignments, were mailed by defendants to plaintiffs. This is a use of the mails for the purpose of a delivery of the securities after sale. And the defendants certainly caused the securities to be so carried. Since the defendants had not registered the securities, this is a violation of 15 U.S.C.A. § 77e(a) (2) * * *." *Id.* 174 F.Supp. at 902–903.

On the question of limitations, the court said:

" * * * The sale was on March 21, 1956. The securities relating to the 'Barrett' were mailed on June 4, 1956, and the securities relating to the 'Mockett No. 1' were mailed on July 24, 1956. The suit was commenced on May 8, 1957. As shown under the discussion of Defense I no violation of 15 U.S.C.A. § 77e occurred until the securities were mailed. Thus, *the violation* of 15 U.S.C.A. § 77L(1) did not occur until on or after June 4, 1956. This is within the one year prior to May 8, 1957; therefore, the statute of limitations had not run on this transaction." *Id.* at 903 (emphasis added).

In Moses v. Michael, 292 F.2d 614 (5th Cir. 1961), plaintiffs brought suit to recover the purchase price of undivided working interests in certain oil and gas leases, which interests were allegedly sold in violation of the Securities Act of 1933.

The sequence of the stages of the transactions were catalogued by the court as follows:

" * * * First, letter agreements were made; next, appellants acquired the interest which they had already contracted to sell in fractional parts; next, the assignments were executed; next, photostatic copies of the assignments were mailed to appellees and the original assignments were sent by appellants from Mississippi to Louisiana and recorded. In every case involved in these appeals, the execution of assignments, the mailing of copies thereof, and the transportation of the original assignments from Mississippi to Louisiana took place within one year prior to the filing of the complaints." *Id.* at 616.

The defendants sought to escape application of the Act by contending that they had not made use of the mails or interstate commerce in carrying out the transactions. The court rejected their contention, stating: "The mailing of a certified copy of each assignment to each appellee was as effective insofar as the Securities Act is concerned as if the original assignment itself had been mailed to the appellees." *Id.* at 618.

Creswell-Keith, Inc. v. Willingham, 264 F.2d 76 (8th Cir. 1959), involved the application of Section 12(2) of the Securities Act of 1933, which proscribes the use of false representations in connection with sale of securities. All of the parties to the suits were residents of Arkansas. All of the alleged misrepresentations were oral and were made face to face in Arkansas, and the securities in question were delivered in Arkansas. However, the mails were used by the plaintiffs to complete the payments due as to each sale.

The court concluded that the Act had been violated. The court said:

"We believe that payment of the consideration for the sale of a security is as much a part of the sale as the delivery of the security." *Id.* at 81.

In Buchholtz v. Renard, 188 F.Supp. 888 (S.D.N.Y.1960), the court denied the defendant's motion to dismiss based upon limitations saying:

"Thus defendants claim that plaintiffs have one year from the date of purchase of the stocks to bring this action. This action was commenced on February 10, 1960 when the original complaint was filed in this court. Rule 3 of the Federal Rules of Civil Procedure. However, § 5 of the Securities Act of 1933, 15 U.S.C.A. § 77e,

states in part that unless a registration statement is in effect as to a security it shall be unlawful ' * * * to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.' Thus, the statute specifically makes 'delivery after sale' unlawful and where there is such a delivery the statute of limitations would not begin to run until the date of such delivery." *Id.* at 892.

In Newberg v. American Dryer Corp., 195 F.Supp. 345 (E.D.Pa.1961), plaintiffs, shareholders in defendant corporation, brought an action to recover the price paid for unregistered stock.

■ In their motion to dismiss, defendants contended that plaintiff's complaint was fatally defective for lack of an averment that the alleged violation occurred not more than one year prior to the date of institution of suit. The court ruled that the plaintiffs must amend their complaint to show compliance with the statute of limitations (15 U.S.C. § 77m) or suffer dismissal of their action. The court said:

"The cases deciding the necessity of pleading compliance with this section 13, the limitations provision of the Act (15 U.S.C.A. § 77m) have arisen from a variety of situations, none of which is identical with that at hand. All, however, have held compliance with the limitations section an essential ingredient of a private action which must be affirmatively asserted. Premier Industries, Inc. v. Delaware Valley Financial Corporation, D.C.E. D.Pa.1960, 185 F.Supp. 694; Osborne v. Mallory, D.C.S.D.N.Y.1949, 86 F. Supp. 869; Fischman v. Raytheon Mfg. Co., D.C.S.D.N.Y.1949, 9 F.R.D. 707, reversed on other grounds 2 Cir., 1951, 188 F.2d 783; Shonts v. Hirliman, D.C.S.D.Cal.1939, 28 F.Supp. 478." *Id.* at 352.

It is clear from *Newberg*, and the cases cited therein, that the plaintiff in a securities action must plead and prove facts showing that he is within the statute.

■ Plaintiff filed his complaint in the present suit on July 1, 1968. Other relevant dates are as follows:

| Lease | Date of Joint Venture | Date of First Payment |
|---|---|---|
| Keusch, sometimes called Jasper North, Dubois County, Indiana | 4/10/67 | 6/5/67 |
| McClurkin Gibson County, Indiana | 5/9/67 | 6/5/67 |
| Spore Gibson County, Indiana | 6/29/67 | 7/22/67 |
| Perry Gibson County, Indiana | 6/29/67 | 8/23/67 |
| Schumacher Gibson County, Indiana | 9/22/67 | 10/14/67 |
| Beckley Warrick County, Indiana | 10/24/67 | 11/9/67 |

This court concludes from the testimony adduced before it that, with regard to each of the transactions, the joint venture agreements were presented to plaintiff via face-to-face contacts with either Mr. Bath or Mr. Chandler. Plaintiff returned the signed agreement to either Mr. Bath or Mr. Chandler. Thus, the statute was not violated at this point, there being no use of the mails or other instrumentalities of interstate commerce. It is unequivocally clear from the testimony, however, that defendant mailed invoices to plaintiff stating the amount due and owing pursuant to the joint venture agreements, and that in each instance plaintiff mailed his payment to defendant. At this point in time, the statute was violated and the limitations period began to run. Based upon these findings, the court must conclude that the first two transactions, with regard to the Keusch and McClurkin wells, are barred by limitations.

Citing Repass v. Rees, *supra*; Moses v. Michael, *supra*; Creswell-Keith, Inc. v. Willingham, *supra*; and, Wall v. Wagner, *supra*, plaintiff points to the fact that a violation of the Act may be found at any stage of the transaction. Thus, although he concedes that his first payment in each transaction via the United

States mails violated the Act, he contends that his subsequent payments on the same transactions also violated the Act and since these payments were within the statutory periods the transactions in question are not time barred. Plaintiff's position is untenable. The violation which commences the running of the statute must be the first violation. Otherwise, the statute of limitations would be rendered meaningless. This is particularly true where, as in the present case, the plaintiff has control over succeeding violations, i. e., by making further installment payments.

A close look at the cases reviewed above will show that the courts found it necessary to look at later stages of the transaction, such as payment or delivery, to find a violation because all previous stages of the transactions in question were carried on intrastate and were not in violation of the Act. One cannot conclude from these cases that if each successive stage of the transaction violates the Act the statute of limitations expands concomitantly.

In Buchholtz v. Renard, *supra*, the court stated that where there is delivery after sale "the statute of limitations would not begin to run until the date of such delivery." The opinion in Buchholtz was written in response to a motion to dismiss. The factual setting of this case is not revealed by the opinion. The case cited no authority for the above-stated proposition. If the Act has been violated during a prior stage of the transaction, what justification is there for withholding the running of the statute of limitations until the date of some subsequent delivery?

Plaintiff's contentions were specifically considered in Athas v. Day, 186 F. Supp. 385 (D.Colo.1960), and were rejected by the court. The court said:

"Plaintiffs attempt to avoid the time limitation by asserting that various acts which were essential to the completion of the sale extended the date of the sale either to July 1955 when the 13 separate assignments were delivered to Richard Bird to be forwarded to the various purchasers; or to November or December 1955 when the Securities Exchange Commission cleared the certificates and they were forwarded to the Registrar and Transfer Company to be transferred to the new purchasers; or to February 18, 1956 when the Registrar and Transfer Company issued new certificates to the plaintiffs and mailed them to Richard Bird. It would be a perversion of the requirements and purpose of the Act to permit such elasticity." *Id.* at 388.

Section 2(11) of the Securities Act provides:

"The term 'underwriter' means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertakings; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission. As used in this paragraph the term 'issuer' shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect control with the issuer." 15 U.S.C. § 77b(11) (1963).

Section 15 of the Securities Act provides:

"Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had

no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o (1963).

In S. E. C. v. North American Research & Development Corp., 424 F.2d 63 (2nd Cir. 1970), the court said:

"[T]he term 'underwriter' is broadly defined to include anyone who directly or indirectly participates in a distribution of securities from an 'issuer' to the public." *Id.* at 72.

■ It is clear that Continental Gulf is an "underwriter" within the language of Section 2(11) of the Securities Act. It is equally clear that plaintiff, who financed the formation of Continental Gulf and is one of three stockholders in the corporation, is along with Messrs. Bath and Chandler a controlling person of Continental Gulf.

In Athas v. Day, *supra*, the court held that one to whom stock was transferred without consideration and for the sole purpose of sale to other parties was an "underwriter" within the purview of the Securities Act of 1933 and accordingly was not entitled to the protections of the Act. Thus, Continental Gulf as an "underwriter" could not seek the protections of the Securities Act. In like manner, plaintiff as a control person of Continental Gulf cannot seek the protections of the Securities Act with regard to those transactions negotiated through Continental Gulf, that is, the transactions relating to the Schumacher and Beckley wells.

Under Section 15 of the Securities Act the controlling person may evade liability if he has "no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability of the controlled person [Continental Gulf] is alleged to exist." Thus, if plaintiff were to qualify for this exemption, he would not be in *pari delicto* and would be able to recover on the Schumacher and Beckley transactions. However, the court finds that plaintiff solicited the Continental Gulf arrangement; was personally familiar with the contract and with the Schumacher and Beckley sales. He both knew and understood that Continental Gulf was to receive commissions for such sales. From the above, the court must conclude that plaintiff did know of "the existence of the facts by reason of which the liability of the controlled person is alleged to exist."

■ Finally, the court has found no convincing evidence that Cherokee Drilling Corporation was a seller in any of the six transactions.

For the reasons given above, the court concludes that plaintiff should be allowed to rescind the two transactions relating to the Spore and Perry wells. The court finds that plaintiff's total investment in these two transactions was $10,312.50. The court further finds that plaintiff has received no income from these two transactions. Thus, he is entitled to the return of the full consideration paid for these securities, with interest.

The clerk will notify counsel for plaintiff to draft an appropriate judgment in accordance with this Memorandum and Order for submission to the court by June 15, 1971, after first obtaining approval of opposing counsel as to form.